774 F.2d 1495
 54 USLW 2246
 Emma F. GILMERE, individually and as Administratrix of the
Estate of Thomas E. Patillo, and for the benefit
of his next of kin, Plaintiff-Appellee,
Cross- Appellant,
v.
CITY OF ATLANTA, GEORGIA, et al., Defendants-Appellants,
Cross-Appellees.
 Nos. 82-8457, 82-8760.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 15, 1985.
 
 Marva Jones Brooks, Mary Carole Cooney, Gearge R. Ference, Atlanta, Ga., for defendants-appellants, cross-appellees.
 J.M. Raffauf, Decatur, Ga., for plaintiff-appellee, cross-appellant.
 Elizabeth J. Appley, Ralph S. Goldberg, Atlanta, Ga., amicus curiae, for ACLU.
 Ira J. Kurzban, Miami, Fla., amicus curiae, for NECL.
 Joel V. Lumer, Neil H. Chonin, Miami, Fla., amicus curiae, for ACLU of Florida & Nat. Emergency Civil Liberties Com'n.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.
 VANCE, Circuit Judge:
 
 
 1
 On New Year's Day in 1980, Thomas Patillo died at the hand of an Atlanta policeman. We accepted this case for en banc consideration primarily to determine whether Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), precludes a claim by his administratrix under 42 U.S.C. Sec. 1983 because state tort law provides a comparable remedy.
 
 
 2
 * The facts as found by the district court disclose that after drinking heavily and driving about Atlanta throughout New Year's Day, Thomas Patillo had a near-collision with a van and then got into an argument with the van's driver. Afterward, the driver called the police and reported that Patillo had pulled a gun from the trunk of his car and threatened him. When Officers Sampson and Craig arrived at Patillo's home, they ordered him to the police car for questioning. Patillo initially put up some resistance by attempting to flee and then flailing his arms about, but these efforts were ineffectual because of his drunken condition. The officers then began escorting him by force and, according to eyewitnesses, began beating him about the head. As the party neared the patrol car, Patillo broke free of their hold. During the ensuing scuffle, Sampson shot Patillo in the stomach and killed him.[1]
 
 
 3
 Patillo's sister, as administratrix of his estate, sued the police officers, their supervisors and the City of Atlanta under 42 U.S.C. Sec. 1983 for violations of his fourth, eighth and fourteenth amendment rights and under state tort law. After a bench trial, the district court held that: (1) both police officers were liable under section 1983 for beating Patillo; (2) Sampson was liable under section 1983 for shooting Patillo; (3) the city was also liable under section 1983 for training Sampson in a grossly negligent manner; (4) the police officers' supervisors were not liable because the plaintiff had failed to prove an "affirmative link" between the supervisors' conduct and Patillo's injuries as required by Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); and (5) the plaintiff's state law claims either were frivolous or would result in damages that would duplicate those already awarded under section 1983. A panel of this court reversed the district court on the first two grounds, concluding that Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), precluded the plaintiff's claims against the police officers because state tort remedies were available to provide redress for the beating and shooting. It also reversed the finding of liability against the city on the ground that municipal liability cannot be predicated on negligence but rather requires proof that the constitutional violations resulted from policies or customs actually developed or affirmatively sanctioned by the city's policymakers. It upheld the district court on the supervisory liability issue and remanded for reconsideration of the state law assault and battery claims in light of its decision to vacate the parallel section 1983 claims. Gilmere v. City of Atlanta, 737 F.2d 894 (11th Cir.1984). We address each of the district court's holdings in turn.
 
 II
 
 4
 The initial and primary focus of our concern is whether Parratt precludes the plaintiff from bringing a section 1983[2] suit against the police officers because there exists a basis for liability under state tort law. Parratt involved a claim by a prisoner against state prison administrators for the negligent deprivation of some mail-order hobby materials valued at $23.50. The Court noted initially that "one might well inquire why respondent brought an action in federal court to recover damages of such a small amount for negligent loss of property." 451 U.S. at 529, 101 S.Ct. at 1910. The Court then went on to hold that the due process clause was not violated because "the deprivation did not occur as a result of some established state procedure," id. at 544, 101 S.Ct. at 1917, and because the state provided adequate procedural due process through its tort claims statute. Id. The tenor of the Court's decision makes clear that its principal concern was to prevent the trivialization of section 1983 into " 'a font of tort law to be superimposed upon whatever systems may already be administered by the States,' " id. at 544, 101 S.Ct. at 1917 (quoting Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976)). The precise scope of the holding remains uncertain, however, and courts throughout the federal circuits have struggled to formulate a workable set of criteria for determining its applicability to other fact situations and other constitutional claims. Some courts have read the case broadly to foreclose section 1983 relief when it overlaps state tort remedies. See, e.g.; Daniels v. Williams, 720 F.2d 792, 795 (4th Cir.1983), cert. granted, --- U.S. ----, 105 S.Ct. 1168, 84 L.Ed.2d 320 (1985); State Bank of St. Charles v. Camic, 712 F.2d 1140, 1147 (7th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983); Rutledge v. Arizona Board of Regents, 660 F.2d 1345 (9th Cir.1981), aff'd on other grounds, Kush v. Rutledge, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). Other courts have sought to make principled distinctions between Parratt and the cases before them, reasoning that the Supreme Court could not have meant to deny every section 1983 plaintiff his day in federal court, no matter how egregious the constitutional violation, simply because of the availability of a similar tort action. See, e.g., Brewer v. Blackwell, 692 F.2d 387, 394-95 (5th Cir.1982); Duncan v. Poythress, 657 F.2d 691, 704-05 (5th Cir. Unit B 1981); Shillingford v. Holmes, 634 F.2d 263 (5th Cir. Unit A 1981). With these conflicting concerns in mind, we turn our attention to the situation before us--the intentional infliction of personal injury and death by means of excessive police force--and we conclude that the legislative history behind the statute, the Supreme Court's own pronouncements in other cases, and the limits set by the Court in Parratt itself all indicate that its holding does not extend to the constitutional claims asserted here.[3]
 
 
 5
 The legislative history of section 1983 has been outlined many times. See Patsy v. Board of Regents, 457 U.S. 496, 502-08, 102 S.Ct. 2557, 2561-63, 73 L.Ed.2d 172 (1982); Mitchum v. Foster, 407 U.S. 225, 238-42, 92 S.Ct. 2151, 2159-62, 32 L.Ed.2d 705 (1972); McNeese v. Board of Education, 373 U.S. 668, 671-72, 83 S.Ct. 1433, 1435-36, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 171-83, 81 S.Ct. 473, 475-82, 5 L.Ed.2d 492 (1961). Whereas one may well need to look hard before finding a congressional intent to make a federal case out of a negligent deprivation of a prisoner's hobby kit, the debates do indicate that a primary motivation behind the passage of the statute was the desire to eliminate the physical violence that was being visited on citizens by those entrusted to keep the peace. Originally called the Ku Klux Klan Act because of its focus on eliminating Klan activities which were terrorizing the South, the Act also was concerned with affording a federal remedy "against incursions under the claimed authority of state law...." Mitchum, 407 U.S. at 239, 92 S.Ct. at 2160. Congress further indicated that both the egregious nature of the harms being reported and the inefficacy of remedies sought in the state courts made the situation serious enough to warrant direct supervision by the federal courts regardless of the existence of comparable remedies under state law. Patsy, 457 U.S. at 502-08, 102 S.Ct. at 2561-63. The harm alleged in this case resulted from exactly the sort of official brutality which prompted passage of the Act. Whether or not the motivations behind police brutality have changed since 1871, and whether or not we may believe that the state courts actually do a better job of affording redress for those harms today, see Neuborne, The Myth of Parity, 90 Harv.L.Rev. 1105 (1977), the statutory grant of federal jurisdiction over section 1983 suits indicates that Congress, at least, continues to adhere to the belief that police abuse is a sufficient threat to constitutional rights to warrant "a federal right in federal courts." Monroe, 365 U.S. at 180, 81 S.Ct. at 480.
 
 
 6
 The Supreme Court's pronouncements in a number of cases indicate likewise that it would not relegate the victim of an intentional and unjustified beating or killing to state tort law in all circumstances. Monroe, the case which opened the door to the expansion of section 1983 litigation by recognizing that the statute created a private right of action, involved an instance of police abuse. 365 U.S. at 169, 81 S.Ct. at 474. In Jones v. Hildebrant, 432 U.S. 183, 185, 97 S.Ct. 2283, 2285, 53 L.Ed.2d 209 (1977), the Court assumed without discussion that the mother of a child who was intentionally shot and killed by a policeman acting under color of state law could sue directly under section 1983 notwithstanding the existence of a state wrongful death statute. See also Wilson v. Garcia, --- U.S. ----, ----, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985) ("Congress ... intended that the remedy provided in Sec. 1983 be independently enforceable whether or not it duplicates a parallel state remedy"). The Court has repeatedly made clear that the right to bring an action under section 1983 need not depend on the exhaustion of state judicial or administrative procedures; see, e.g., Patsy, 457 U.S. at 503, 102 S.Ct. at 2561; Steffel v. Thompson, 415 U.S. 452, 472-73, 94 S.Ct. 1209, 1222-23, 39 L.Ed.2d 505 (1974); Gibson v. Berryhill, 411 U.S. 564, 574, 93 S.Ct. 1689, 1695, 36 L.Ed.2d 488 (1973); McNeese, 373 U.S. at 671-73, 83 S.Ct. at 1435-36. Thus, access to federal court under section 1983 is not in general predicated on actual proof of a failure of the state adjudicatory system. Finally, in Parratt itself the Court indicated that its analysis was not based upon the conclusion that all section 1983 claims were to be turned into state torts whenever possible, but rather that the particular constitutional violation at issue--the deprivation of procedural due process--simply did not occur until the plaintiff was actually denied any procedure for redress in the state system. See Parratt, 451 U.S. at 541-44, 101 S.Ct. at 1916-17. Such reasoning implicitly distinguishes procedural due process claims from all the other constitutional violations that are complete regardless of the subsequent adjudicative procedures being used. See also Hudson v. Palmer, --- U.S. ----, ----, n. 4, 104 S.Ct. 3194, 3208 n. 4, 82 L.Ed.2d 393 (1984) (Stevens, J., concurring in part and dissenting in part).
 
 
 7
 Having thus found that the scope of Parratt is necessarily limited by both the legislative history of section 1983 and the Supreme Court's own pronouncements, we perceive at least two alternative constitutional theories, neither of which was addressed by the Court in Parratt, on which this plaintiff may predicate her section 1983 claim for relief against the police officers. We will first consider the claim under substantive due process and then analyze the substantive fourth amendment claim.
 
 
 8
 * The first potential basis for plaintiff's recovery is substantive due process. As Justice Blackmun noted in his concurrence in Parratt, "there are certain governmental actions that, even if undertaken with a full panoply of procedural protection, are, in and of themselves, antithetical to fundamental notions of due process." 451 U.S. at 545, 101 S.Ct. at 1918 (citations omitted).[4] Those courts of appeals which have addressed substantive due process claims since Parratt have been nearly unanimous in adopting Justice Blackmun's view that substantive due process claims still survive in the wake of Parratt. See, e.g., Hall v. Sutton, 755 F.2d 786 (11th Cir.1985); Daniels v. Williams, 720 F.2d at 796 n. 3; State Bank of St. Charles v. Camic, 712 F.2d at 1147 n. 5; Wolf-Lillie v. Sonquist, 699 F.2d 864, 872 (7th Cir.1983); Duncan v. Poythress, 657 F.2d at 704-05. We too conclude that, notwithstanding Parratt, the substantive due process claim established in this case may be asserted in federal court regardless of the existence of a parallel state tort remedy.
 
 
 9
 Unlike procedural due process claims, which challenge the adequacy of the procedures used by the government in deciding how to treat individuals, substantive due process claims allege that certain governmental conduct would remain unjustified even if it were accompanied by the most stringent of procedural safeguards. Such substantive claims are outside the scope of Parratt because the constitutional violation is complete at the moment when the harm occurs. The existence of state postdeprivation remedies therefore has no bearing on whether the plaintiff has a constitutional claim.
 
 
 10
 The nature of a substantive due process claim in the police abuse context was given broad outline in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), in which the Supreme Court held inadmissible incriminating evidence which had been obtained by subjecting the suspect to a stomach pump. As the Court explained, substantive due process is violated when the government engages in actions which " 'offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.' " 342 U.S. at 169, 72 S.Ct. at 208 (quoting Malinski v. New York, 324 U.S. 401, 416-17, 65 S.Ct. 781, 788-89, 89 L.Ed. 1029 (1945)). The Court conceded at that time that "[t]hese standards of justice are not authoritatively formulated anywhere as though they were specifics," id., and concluded only that substantive due process is violated by state conduct that "shocks the conscience" or constitutes force that is "brutal" and such as "to offend even hardened sensibilities." Id. at 172-73, 72 S.Ct. at 209. Since Rochin, however, the lower courts have developed more definite standards for identifying substantive due process violations. As noted in the seminal case of Johnson v. Glick, 481 F.2d 1028 (2d Cir.1973), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), the violations which give rise to a substantive due process claim are necessarily more egregious than those which give rise to simple tort actions. In Judge Friendly's words,
 
 
 11
 Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.
 
 
 12
 Id. at 1033. The predecessor to this circuit has adopted the Johnson v. Glick factors as the guiding standard for substantive due process claims, see Williams v. Kelley, 624 F.2d 695, 697 (5th Cir.1980), cert. denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981); Hamilton v. Chaffin, 506 F.2d 904, 909 (5th Cir.1975). Cf. Tolbert v. Bragan, 451 F.2d 1020 (5th Cir.1971).
 
 
 13
 The court below properly cited the Johnson factors in addressing the plaintiff's substantive due process claim. It found on the basis of those factors that both police officers were liable for beating Patillo, and that Sampson was liable for shooting him. It therefore remains only for us to determine whether the court was correct in applying the Johnson factors to the facts before it.
 
 
 14
 In holding both officers liable for beating the decedent, the court found that the beating occurred "with little or no provocation" and that "the blows were not delivered in a good faith effort to control Patillo, but rather out of irritation at his initial resistance...." If supported by the record, these findings would suffice to make out a substantive due process violation under both Johnson and Rochin. Our reading of the record discloses that the court's findings have evidentiary support. Those findings were based on the lack of independent evidence that Patillo provoked the beating in any significant way; by the fact that he was an older, smaller, and unarmed man who was clearly intoxicated; and by credibility evaluations of the officers and of numerous eyewitnesses who testified. We therefore see no reason to disturb this aspect of the district court's holding.
 
 
 15
 The court also held Sampson liable on substantive due process grounds for the shooting of Patillo. As it noted, such action clearly implicated at least one of the Johnson factors in that the injury inflicted constituted the most serious harm possible. The district court found that Sampson's purported fear of bodily injury was subjectively reasonable, given that at the time of the shooting the decedent was apparently free and moving toward him. The court declared, however, that the issue of whether Sampson's use of deadly force was reasonable was "a close question." It ultimately decided "with some hesitation" that Officer Sampson's belief that his life was in danger was not objectively reasonable and could not justify the killing. In another context we might have difficulty concluding that these findings establish a constitutional violation sufficiently egregious to "shock the conscience" as required by Rochin. Here, however, any fear on the officer's part was the fear of retaliation against his own unjustified physical abuse. We conclude that a moment of legitimate fear should not preclude liability for a harm which largely resulted from his own improper use of his official power. For this reason, we affirm this portion of the district court's holding as well.
 
 B
 
 16
 The plaintiff also asserted a claim against both police officers under the fourth amendment,[5] which provides in relevant part that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures shall not be violated." As the Supreme Court recognized in Monroe, a violation of the fourth amendment gives rise to a private cause of action under section 1983. See also Wolf-Lillie v. Sonquist, 699 F.2d 864, 871 n. 13 (7th Cir.1983); Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir. Unit A 1981); Jenkins v. Averett, 424 F.2d 1228, 1232 (4th Cir.1970). The existence of state tort remedies is no bar to the direct assertion of such a claim in federal court. As noted in Monroe, "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." 365 U.S. at 183, 81 S.Ct. at 482. The Court in Parratt took pains to avoid disturbing this aspect of Monroe, acknowledging that section 1983 claims involving a violation of an enumerated constitutional right were substantively different from those based solely on fourteenth amendment due process. Parratt, 451 U.S. at 536, 101 S.Ct. at 1913. See also Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 3210 n. 9, 82 L.Ed.2d 393 (1984) (Stevens, J., concurring in part and dissenting in part). The sole issue before us in evaluating this claim, therefore, is whether the plaintiff made out the elements of an unreasonable seizure.
 
 
 17
 As the Court recently noted, "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." Tennessee v. Garner, --- U.S. ----, ----, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Under that standard, a seizure clearly occurred in the case before us. A seizure is not unconstitutional, however, unless it is "unreasonable." Reasonableness is to be determined by " 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " Id. at ----, 105 S.Ct. at 1699 (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). In conducting this balancing test, we are to consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).
 
 
 18
 Here we have little difficulty in concluding that the beating and killing of Patillo were sufficiently serious to be actionable under the fourth amendment. Patillo's fourth amendment interest in his bodily security was clearly significant, and his "fundamental interest in his own life need not be elaborated upon." Garner, --- U.S. at ----, 105 S.Ct. at 1700. Even such weighty individual interests may conceivably be counterbalanced by governmental interests in effective law enforcement. In this case, however, the district court's findings establish that the harms visited on the decedent while in the officers' custody were only minimally, if at all, necessary to enable them to carry out their official duties. The events occurred in an outdoor parking lot in the late afternoon, at a sufficient distance from bystanders to establish that the surroundings posed no particular threat to the safety of the officers. Cf. Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884 (citing safety threats in jails as one possible justification for intrusive searches and seizures). Furthermore, the police had little cause to believe Patillo himself to be dangerous. Given his small size, intoxicated state, and lack of a weapon, he clearly posed little threat to their safety when they initially began escorting him to the patrol car. Finally, as we have pointed out in section A above, the district court's findings of fact establish that Patillo did little to provoke the police officers to beat him. That unwarranted intrusion, as well as the unwarranted shooting which directly resulted from his efforts to escape the officers' further physical abuse, give grounds for relief under the fourth amendment.
 
 III
 
 19
 The plaintiff also alleged, and the district court found, that the City of Atlanta should be held liable under section 1983 for the harms visited on the decedent. The panel reversed on the ground that the court had used an improperly low standard for determining municipal liability. We too reverse the district court, but for different reasons set forth below.
 
 
 20
 The evaluation of any section 1983 municipal liability claim necessarily begins with an examination of Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In that case, the Court made clear that municipal liability must be predicated on more than a respondeat superior theory. The plaintiff must show that the government employees' unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or else is "visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision making channels." Monell, 436 U.S. at 690-91, 98 S.Ct. at 2036.
 
 
 21
 Though Monell thus established that the basis for municipal liability could be found in either "policy" or "custom," the Court expressly declined to clarify the nature of the showing required from the plaintiff to implicate the municipality. The Court deemed it better to defer "further development of this action to another day." Id. at 695, 98 S.Ct. at 2038. The district court attempted to clarify the meaning of the Court's terminology by concluding that municipal liability could be established by a showing that the city exhibited "gross negligence" or "deliberate indifference" in failing to take measures to prevent the unconstitutional actions of its employees. Then, applying that standard to the facts before it,[6] the court determined that the plaintiff had met her burden of proof by showing that the city had negligently failed to give Sampson adequate psychological testing or to retrain him sufficiently upon his return to the police force in 1978.[7] In reversing the district court, the panel rejected the lower court's gross negligence standard. In the panel's view, the city could be held liable only if the plaintiff produced evidence that the constitutional violators' actions had actually been initiated, or at least implicitly ratified, by those representing official policy.
 
 
 22
 The cases from this circuit which were cited by the panel do not clearly support the standard of affirmative official ratification which it articulated,[8] and cases from other circuits are in direct conflict.[9] There exists, therefore, substantial disagreement as to whether gross negligence can suffice to establish municipal liability. We find it unnecessary at this time to state the rule to be followed by this circuit, however, as we find that plaintiff has failed to make out a case against the city even under the gross negligence standard. At most she established that the city failed to train one single policeman properly in the appropriate methods of avoiding the use of deadly force. Even if such failure could be said to be "the moving force of the constitutional violation," as required by Monell, see Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (quoting Monell, 436 U.S. at 695, 98 S.Ct. at 2038), the plaintiff's proof did not in any case satisfy Monell's further requirement that the failure resulted from a custom that was "so permanent and well settled" as to have "the force of law." Monell, 436 U.S. at 691, 98 S.Ct. at 2036.[10] Indeed, the evidence showed that the city had substantially modified its police training procedures subsequent to Sampson's initiation as a policeman in 1974 and that his failure to receive further training upon being rehired in 1978 was an anomaly resulting from his prior service on the police force. Accordingly, we reverse the district court's holding that the city is liable to the plaintiff under Sec. 1983.
 
 IV
 
 23
 Finally, we address plaintiff's claim against various of the police officers' supervisors, including Maynard Jackson, the mayor, Lee Brown, the public safety commissioner, and George Napper, the chief of police. The district court found for these defendants on the ground that the plaintiff had failed to establish the existence of an "affirmative link," as required by Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), between the death of Patillo and the action or inaction of any of the three supervisors.
 
 
 24
 We agree. There is no evidence in the record that any of these defendants participated directly in the shooting of Patillo, and although Brown and Napper may have had the right to control the actions of the police officers, they could not be held liable under section 1983 for having "the mere right to control without any control or direction having been exercised...." Monell, 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58.
 
 V
 
 25
 The plaintiff also sought damages under several state tort theories, including false arrest, false imprisonment, and assault and battery. The district court rejected each of these claims either because the individual claim lacked merit or because it would have resulted in damages duplicative of those already awarded to the plaintiff under section 1983. In light of our partial reversal, we direct the court to reexamine the state tort claims on remand to determine whether there are now live claims against any of the defendants.VI
 
 
 26
 In conclusion, we affirm the district court's holding that Officers Craig and Sampson are liable for beating Thomas Patillo in violation of his constitutional rights, that Officer Sampson is liable for shooting Patillo in violation of his constitutional rights, and that their supervisors are not liable under the federal claims for the officers' misconduct. We reverse its finding of municipal liability, and remand for further consideration of the plaintiff's state law claims in light of the foregoing opinion. We vacate the award of costs and attorney's fees under 42 U.S.C. Sec. 1988 and remand for further consideration in light of this opinion and the additional proceedings that have taken place since the district court's original awards.
 
 
 27
 AFFIRMED in part, REVERSED in part, VACATED in part and REMANDED.
 
 
 28
 TJOFLAT, Circuit Judge, concurring in part and dissenting in part in which RONEY and FAY, Circuit Judges, join in Part III:
 
 I.
 
 29
 This is an action to recover money damages for injuries suffered by a citizen as a result of a tragic encounter with the police. On New Year's Day, 1980, Thomas Patillo drove about the city of Atlanta visiting friends and drinking heavily.[1] He returned home around 5:00 p.m. and pulled into a service station across the street from his house to buy some gas. As he was leaving, he nearly collided with a red van also leaving the station. The two drivers got out of their vehicles and exchanged words. Patillo pulled a handgun from his trunk and threatened the driver, who in turn ran for a telephone and called the police. Atlanta Police Officers C.C. Craig and R.C. Sampson responded to the call. By this time, Patillo had returned home and parked his car in front of his house. The two officers, accompanied by the driver of the van, walked to Patillo's house and knocked on his door. Patillo came to the door, and the driver of the van identified him as the man who had threatened him with a gun. Patillo's friends began to gather about, and the officers decided to question Patillo away from the house.
 
 
 30
 Officer Sampson grabbed Patillo, who was quite drunk, to steady him as they walked away from the house. When they reached the sidewalk Patillo attempted to flee. Sampson caught him and held him by the back of the belt while Officer Craig grabbed his arm. They decided to take him to their patrol car which was parked in an adjacent parking area. Once again Patillo tried to escape, flailing his arms at the officers. In the ensuing scuffle the officers struck Patillo about the head with their hands a number of times.[2]
 
 
 31
 The officers eventually got Patillo to their patrol car. As they approached the car, Patillo wrenched himself free and grabbed Officer Craig's holstered revolver. The revolver became dislodged and fell to the ground. Patillo lunged at Sampson, who, fearing that Patillo had the gun, reacted by pulling his revolver and firing two shots into Patillo's abdomen. Patillo died thirty minutes later.
 
 
 32
 The administratrix of Patillo's estate filed suit against Officers Craig and Sampson,[3] seeking the money damages her decedent, Patillo, allegedly would have been entitled to recover had he survived.[4] Proceeding under 42 U.S.C. Sec. 1983 (1982),[5] plaintiff alleged that the defendants, acting under color of state law, subjected Patillo to cruel and inhuman punishment, an unreasonable seizure, and deprived Patillo of his life[6] and liberty without due process of law, in violation of the eighth, fourth, and fourteenth amendments.[7]
 
 
 33
 In its dispositive order the district court found the eighth amendment claim meritless. See Ingraham v. Wright, 430 U.S. 651, 659-71, 97 S.Ct. 1401, 1406-12, 51 L.Ed.2d 711 (1977) (eighth amendment rights attach only upon conviction). The district court rejected the fourth amendment claim because the officers had probable cause to detain Patillo. The court, however, found that the officers had deprived Patillo of his liberty without due process of law on two occasions: when Patillo was struck by the officers and when he was shot by Officer Sampson.[8]
 
 
 34
 A panel of this court reversed the district court's judgment as to the officers.[9] The panel affirmed the court's treatment of the fourth and eighth amendment issues, but found that the court erred in finding that Patillo had been deprived of liberty without due process of law, in violation of the fourteenth amendment. The panel relied on Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), which holds that, where a state employee's actions were random and not authorized by state law or policy and the State provides an adequate damages remedy for the deprivation in state court, no fourteenth amendment violation occurs because the State has provided all the process which is due. Since the police officers' conduct was random and unauthorized and Georgia provided an adequate damages remedy for the deprivation,[10] the panel found no fourteenth amendment due process violation.
 
 
 35
 Subsequent to the panel's decision, the Supreme Court handed down its opinion in Tennessee v. Garner, --- U.S. ----, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Court held that, in a suit for money damages, a finding of probable cause does not end the inquiry as to whether a citizen's seizure was constitutional; the trial court must examine the reasonableness of the manner in which the citizen was seized. Today the en banc court holds that the officers' encounter with Patillo violated the fourth amendment as interpreted by Garner. In addition, the majority creates a substantive constitutional right duplicative of the protections provided by the fourth amendment.
 
 
 36
 I find that Garner does not counsel a finding of a fourth amendment violation in this case. Moreover, since I view the fourth amendment as the exclusive constitutional vehicle for dealing with seizures of the type involved in this case, I reject the creation of an additional and unnecessary fundamental right addressing such seizures. For these reasons, I dissent.
 
 II.
 
 37
 The majority finds section 1983 liability against the two officers based upon the fourth amendment.[11] The district court and the panel found no fourth amendment constitutional violation in accordance with the law at that time. While it is true that an unreasonable seizure by police officers may rise to the level of a violation of a citizen's fourth amendment rights, the majority's analysis, leading to the conclusion that such a constitutional infringement occurred in this case, is, I submit, flawed.
 
 
 38
 The Supreme Court, in Tennessee v. Garner, --- U.S. ----, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), interpreted the fourth amendment as prohibiting police officers from shooting nondangerous fleeing suspects.[12] The Court began its analysis with the premise that an officer's use of deadly force in apprehending a citizen is a seizure that is subject to the reasonableness requirement of the fourth amendment. Garner represents the Court's first application of the fourth amendment's reasonableness requirement to the use of force by police to detain a person.[13] Thus, the mere fact that the seizure was lawful does not end the inquiry; "reasonableness depends on not only when a seizure is made, but also how it is carried out." Tennessee v. Garner, --- U.S. at ----, 105 S.Ct. at 1699.[14]
 
 
 39
 Reiterating the traditional fourth amendment method of analysis, the Court determined the reasonableness of the manner in which a seizure was carried out by balancing the degree of intrusion on the citizen's fourth amendment rights, i.e., the degree of force employed in detaining the individual, with the government's interests in effectuating the detention. Id. at ----, 105 S.Ct. at 1699. See also, e.g., Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The reasonableness analysis is two-fold, focusing first upon the facts available to the officer, a factual determination, and next, upon the reasonableness of the officer's response, a legal determination.
 
 
 40
 The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?
 
 
 41
 Terry v. Ohio, 392 U.S. at 21-22, 88 S.Ct. at 1880 (footnote omitted). Thus, not all governmental intrusions are constrained by the fourth amendment, but only those intrusions which are not justified by the circumstances. Schmerber v. California, 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). See also, e.g., Terry v. Ohio, 392 U.S. at 9, 88 S.Ct. at 1873 (the right to be free from governmental intrusion is shaped by the context in which it is asserted). Even unreasonable conduct may in some instances not be actionable in a section 1983 suit based upon an alleged violation of the fourth amendment where the injury is too minor to rise to the level of a constitutional violation. Baker v. McCollan, 443 U.S. 137, 144-45, 99 S.Ct. 2689, 2694-95, 61 L.Ed.2d 433 (1979) (plaintiff's three-day detention in jail resulting from a valid warrant, despite his correct assertion that he was not the person against whom the warrant was issued, did not rise to the level of a constitutional violation).
 
 
 42
 The conduct of the state official or employee must be "sufficiently egregious as to be 'constitutionally' tortious." Williams v. Kelley, 624 F.2d 695, 697 (5th Cir.1980), cert. denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981) (prison guards' fatal choke hold on a prisoner in order to protect their own safety and maintain order was not sufficiently egregious so as to rise to the level of a violation of the prisoner's eighth amendment rights). See also, e.g., Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (medical malpractice on a prisoner did not constitute a violation of the prisoner's eighth amendment rights when there was no evidence of deliberate indifference to serious medical needs); Hull v. City of Duncanville, 678 F.2d 582 (5th Cir.1982) (municipal officials' negligent failure to maintain railroad crossing or provide adequate signals, causing an injurious vehicle accident at the crossing, not egregious enough to be constitutionally tortious); Rutledge v. Arizona Board of Regents, 660 F.2d 1345 (9th Cir.1981), aff'd, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983) (a minor battery by a prison guard may not suffice to state a claim under section 1983 based upon an eighth amendment violation). "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles." Baker v. McCollan, 443 U.S. at 146, 99 S.Ct. at 2695-96. In the fourth amendment context, the Supreme Court has recognized that relatively minor tortious conduct by police officers will not negate the constitutionality of a search. See Dalia v. United States, 441 U.S. 238, 258, 99 S.Ct. 1682, 1694, 60 L.Ed.2d 177 (1979) ("officers executing search warrants on occasion must damage property in order to perform their duty"). The determining constitutional factor in all such inquiries is whether the police activity was reasonable.
 
 
 43
 Applying this analysis to the facts in this case, I find that the officers' actions were not unreasonable and did not violate Patillo's fourth amendment rights. There is no question that as Officers Sampson and Craig led Patillo from his house, a "seizure" occurred,[15] implicating the fourth amendment. The issue before us is whether, based upon the circumstances present at the time, the officers' method of effectuating that seizure was reasonable. It is undisputed that the officers had probable cause to make a brief investigative detention under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), once the driver of the red van identified Patillo as the one who had threatened him with a gun. In addition, the Constitution permitted the officers to exert reasonable force to effectuate the detention and prevent Patillo's escape. See Garner, --- U.S. at ----, 105 S.Ct. at 1699-1700.
 
 
 44
 The district court found that the officers' use of their hands about the head and neck of Patillo was unnecessary to effectuate the detention. The court, however, failed to extend the inquiry to determine the reasonableness of the seizure in a fourth amendment context, which requires a balancing between the degree of force used to seize the citizen and the government's interest in detaining him. See Garner, --- U.S. at ----, 105 S.Ct. at 1699; cf. Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). While it is true that Patillo experienced some physical discomfort, there is no evidence that he was in any way injured in the altercation; there were no marks of any kind upon Patillo's scalp, face, or back. In fact, Patillo, even though he was drunk, was able to break free from the officers and grab for one of their service revolvers. As already noted, the abuse of governmental power must be sufficiently egregious to raise an ordinary tort by a police officer to the stature of a violation of the fourth amendment. See Garner, --- U.S. ----, 105 S.Ct. at 1699-1700. I do not perceive the minor altercation between Patillo and the officers as rising to this level.
 
 
 45
 In my view the shooting of Patillo, although tragic, did not constitute an unreasonable seizure. The shooting resulted from Officer Sampson's reasonable belief that his life was in danger.[16] As the officers and Patillo entered the area where their patrol car was parked, Patillo broke away and grabbed Officer Craig's holstered revolver; the revolver became dislodged and fell to the ground; Patillo then lunged at Sampson. Officer Sampson knew that Patillo was uncontrollable and could be violent; he knew Patillo was drunk; he knew Patillo had wielded a gun a short time earlier over a simple traffic mishap; in short, he thought his life was in danger. The fourth amendment does not require that "police officers take unnecessary risks in the performance of their duties." Terry v. Ohio, 392 U.S. at 23, 88 S.Ct. at 1881. When an officer has cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others, he does not act unreasonably under the fourth amendment by using deadly force to protect himself. See Tennessee v. Garner, --- U.S. at ----, 105 S.Ct. at 1701. Accordingly, Officer Sampson's shooting of Patillo, though sadly unfortunate, was reasonable in light of the particular circumstances.[17]
 
 III.
 
 46
 In addition to finding that the officers violated Patillo's fourth amendment rights, the majority perceives an infringement of his fundamental right, independent of the fourth amendment, to be free from unreasonable and unnecessary force during police-citizen encounters. Although the majority treats this right as rooted in the Constitution, it does not specify its origin. This right is not specifically enumerated in the Bill of Rights, and I find no indication in the legislative history that the framers of the fourteenth amendment intended to create it. I therefore view the majority's holding as unwarranted.
 
 
 47
 The Bill of Rights addresses police-citizen encounters of the sort involved in this case exclusively in the fourth amendment, which evidences the framers' intent to treat such affairs solely under that amendment. The fourth amendment was designed to prevent the abuses of unreasonable searches and seizures occasioned by the infamous writ of assistance, suffered during English rule.[18] This amendment was clearly intended to be the constitutional vehicle regulating police-citizen interactions.[19] This implies that in drafting an amendment specifically dealing with police-citizen interaction, the framers intended all constitutional analysis involving such encounters to begin and end with the fourth amendment.[20] The passage of the fourteenth amendment does not alter the analysis because there is no indication that police-citizen encounters were to be regulated to any greater or lesser extent under this amendment than under the fourth. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The majority creates this fundamental right under the rubric of substantive due process.[21] In so doing it ignores Supreme Court jurisprudence teaching restraint in the use of this doctrine, see Ferguson v. Skrupa, 372 U.S. 726, 731-32, 83 S.Ct. 1028, 1031-32, 10 L.Ed.2d 93 (1963); moreover, the created right merely duplicates the protections provided by the fourth amendment. This is why I conclude that the majority's creation of a fundamental right which alternatively addresses the events in this case is unwarranted.
 
 IV.
 
 48
 I would adopt the panel's disposition of this case and reverse the district court's finding of liability on the part of the officers under section 1983. The state law assault and battery count should be remanded to the district court with directions to hold the officers liable under the claim and to assess damages against them in accordance with Georgia law.
 
 
 49
 JOHNSON, Circuit Judge, concurring in part and dissenting in part, in which HATCHETT, Circuit Judge, joins:
 
 
 50
 I join parts I, II, IV and V of the Court's opinion. I disagree, however, with the Court's treatment of the issue of municipal liability in this case. While part III of the opinion does not set forth any objectionable principles of municipal liability under Section 1983, it is based upon a mistaken understanding of the evidence produced at trial. I therefore respectfully dissent from the Court's holding in part III.
 
 
 51
 I. EVIDENCE NEEDED TO PROVE MUNICIPAL LIABILITY
 
 
 52
 In Monell v. Department of Social Services of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court interpreted 42 U.S.C.A. Sec. 1983 (West 1981) to make municipalities liable for deprivations of rights secured by the Constitution and laws of the United States whenever the municipality itself subjects a person or causes a person to be subjected to that deprivation. While the city is not liable on a respondeat superior basis, it is liable for deprivations for which it fairly can be blamed. According to the Monell decision, a plaintiff shows that the municipality has subjected him or her to a deprivation if a "custom" or "policy" of the city is the "moving force" behind the deprivation. Id. at 690-94, 98 S.Ct. at 2035-38. Therefore, in order to hold a municipality liable under Section 1983 a plaintiff must prove (1) the existence of a custom or policy, (2) some fault on the part of the city in establishing or tolerating the custom or policy, and (3) a sufficient causal link between the custom or policy and the legal deprivation.
 
 
 53
 A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. Hearn v. City of Gainesville, 688 F.2d 1328, 1334 (11th Cir.1983). A custom is a practice that is so settled and permanent that it takes on the force of law. Monell, 436 U.S. at 690-91, 98 S.Ct. at 2035-36. A pattern of injuries is not necessary to show the existence of a custom or policy, for a municipality may deliberately establish a practice that leads to a single deprivation. Provided the requisite fault and causal link are present, the municipality may be held liable for the deprivation. See Trezevant v. City of Tampa, 741 F.2d 336 (11th Cir.1984). Proof of a single incident of unconstitutional activity may be sufficient to impose liability under Monell where proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy which can be attributed to a municipal policymaker. City of Oklahoma City v. Tuttle, --- U.S. ----, ----, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985) (plurality opinion); id. at ----, 105 S.Ct. at 2439 (Brennan, concurring) (Section 1983 cause of action "is as available for the first victim of a policy or custom that would foreseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims").
 
 
 54
 The second element of proof necessary to establish municipal liability has to do with fault. The Supreme Court's interpretation of the legislative history of Section 1983 in Monell is now understood to mean that municipal liability should not be imposed when the municipality was not itself at fault. Tuttle, supra, at ----, 105 S.Ct. at 2433. Hence, a city may not be held liable under Section 1983 for every constitutional violation caused by its policies and customs; the city must be at fault in some sense for establishing or maintaining the custom or policy. A city can be blamed for establishing a custom or policy if constitutional violations are the foreseeable result of that decision.
 
 
 55
 Without attempting to define the exact boundaries of the fault standard, it can be said that city policies that are grossly negligent or deliberately indifferent to constitutional rights could lead to municipal liability because constitutional deprivations are the foreseeable result of such policies. See Herrera v. Valentine, 653 F.2d 1220 (8th Cir.1981); Owens v. Haas, 601 F.2d 1242 (2d Cir.), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). While the mere right to control without any exercise of control or direction or any failure to supervise is not enough to support Section 1983 liability, Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); see Monell, 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58; Polk County v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (allegation of administrative negligence fails to state claim under Section 1983), the fact that city officials do not take affirmative actions does not always absolve them of blame, for deliberate inaction can foreseeably lead to constitutional deprivations. Cf. Languirand v. Hayden, 717 F.2d 220 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984).
 
 
 56
 The final element of proof for municipal liability is causation: the plaintiff must show that the municipal policy or custom was the "moving force of the constitutional violation." Monell, supra, 436 U.S. at 694, 98 S.Ct. at 2037. Once a plaintiff has established that a policy exists and that the city is at fault for establishing or maintaining the policy or custom, there remains only the straightforward task of showing that the deprivation of rights secured by the Constitution or laws of the United States resulted from the policy in question.
 
 II. EVIDENCE PRESENTED IN THIS CASE
 
 57
 The district court in this case held the city liable for the shooting because it had negligently failed to give Sampson psychological testing or training after he was rehired. I agree with the majority that this finding is an insufficient basis for municipal liability, for the improper selection and training of a single police officer did not constitute a settled custom or policy of the city. Cf. Berry v. McLemore, 670 F.2d 30, 33 (5th Cir.1982). Nevertheless, the judgment against the city should only be vacated and remanded to the district court rather than being reversed because the district court failed to make findings regarding evidence presented by the plaintiff that might have established municipal liability under the proper legal standards.
 
 
 58
 The district court's order states that the plaintiff presented evidence of various aspects of the city's allegedly inadequate selection, training and supervision of officers. In addition to the failure to test and retrain Sampson, the plaintiff presented testimony regarding the city's general failure to administer psychological tests to applicants until sometime before Craig was hired. There was also considerable evidence regarding the city's alleged failure to require officers to carry nightsticks. Despite the availability of various city "policies" upon which to base liability, the order relied exclusively on the failure to test and retrain Sampson: "Plaintiff alleges a wide range of inadequacies [regarding the selection, training and supervision of officers], but the Court needs to consider only one."
 
 
 59
 Therefore, the record does not yet reveal whether the proof submitted by the plaintiff was sufficient to establish municipal liability. While one portion of the evidence (the portion relied upon by the district court) was insufficient, factual findings regarding other pieces of evidence have not yet been made. I would vacate the judgment against the city and remand for further factfinding in light of the legal principles discussed above.
 
 JAMES C. HILL, Circuit Judge, dissenting:
 
 60
 In my view this is a procedural due process claim under the Fourteenth Amendment. I do not view this as a Fourth Amendment violation. The seizure had taken place pursuant to adequate cause. The Fourth Amendment specifically addresses police-citizen encounters, but the Fourteenth Amendment yet prohibits police from depriving those who have been taken into custody of life, liberty or property without due process of law.
 
 
 61
 The claim is asserted for deprivation of a liberty interest. No claim was brought under the Georgia Wrongful Death statute. This interest is protected from deprivation under color of state law without due process by the Fourteenth Amendment.
 
 
 62
 The primary issue we took en banc was the effect of Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) on such a claim.
 
 
 63
 My view falls somewhere between Judge Vance's relegation of Parratt to claims involving trivial property deprivation and those who view Parratt as barring all Sec. 1983 claims when state law provides an apparent remedy.
 
 
 64
 The bar to a Sec. 1983 action under the Parratt rationale does extend to more than cases involving property of small value. Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) involved liberty, as does this case. Yet, I am now persuaded that the mere existence of a state statute said to provide redress for the wrong inflicted under state law will not automatically insulate a wrongdoer from the federal forum. Section 1983 was enacted to provide a federal remedy in those situations where there existed no state remedy and where, in fact, recourse to the state remedy would be of no practical value. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).
 
 
 65
 Section 1983, called the Ku Klux Klan act, was born at a time when inadequacy of recourse to state remedy for the wrongs with which it was concerned could be judicially noticed. It was reborn in the era of state and regional adverse reaction to the implementation of constitutional rights of minorities. State forums could be assumed inadequate to the redress of wrongs inflicted upon civil rights advocates.
 
 
 66
 Parratt addressed a situation where the court could know that Nebraska's courts were adequate to a claim that a state officer had lost petitioner's $23.50 hobby kit. In Ingraham, the Court was willing to know that Florida law and procedure was acceptable for the vindication of a claim that corporeal punishment (a "paddling") by school administrators had escalated into unlawful assault.
 
 
 67
 We are instructed by these cases that no Sec. 1983 claim will lie where there is not only state law and procedure "on the books," but it can be known to be adequate in fact. We are also told that, if we know that recourse to state law may not be expected to provide relief, Sec. 1983 may be invoked. Just how we are to acquire that knowledge in cases falling between the environments in several states late in the 19th century (and repeated in the early decades of the second half of the 20th century), on the one hand and Nebraska's view of the deprivation of $23.50 in property in 1981 is not clear. Had Patillo's survivor filed suit for wrongful death (or his administrator for a surviving claim for injury) in the Superior Court of Fulton County, Georgia, would she have found a receptive, adequate forum? To say that the availability of a state remedy is immaterial appears to abide Monroe v. Pape, (a Fourth Amendment violation case) but it seems inappropriate in a due process case to hold immaterial that which was found by the High Court to be controlling in Parratt and Ingraham. Yet, I am not prepared to say that district judges are required to hold hearings and make findings as to the adequacy in fact of recourse to state courts in all of the counties and judicial districts embraced in their federal court districts.
 
 
 68
 One may find the "bright line" defined by ascertaining what the established state policy is. If the deprivation without due process results from established state policy, the person deprived may invoke Sec. 1983; if it results from random acts of one acting under color of state law, but not in accord with state policy, and a state remedy exists, no federal claim is to be found. One who has suffered a loss of federally protected rights as a result of action taken pursuant to state policy ought not be relegated to state procedures for redress. Where state policy denounces the infliction of the wrong, its institutions should satisfy due process.
 
 
 69
 Today such a rule seems the only one available to bring ourselves in line with Parratt and yet afford a federal forum to those for whom state remedies would be of little value. Therefore, I should reverse the judgment against the officers entered upon a finding of their random acts, contrary to state policy. Thus, with the misgivings of one seeking to discern a rule as opposed to following one, I dissent.
 
 
 
 [1]
 Reports of what happened in the seconds before the shooting diverged significantly. The officers testified that Patillo broke away, grabbed Craig's gun from the holster, and had begun to level it at Sampson when Sampson drew his revolver and fired twice. None of the eyewitnesses saw Patillo reach for Craig's revolver, and none of them saw a gun in Patillo's hand at any time. The court weighed this conflicting testimony and concluded:
 [T]he officers were striking Patillo as he tried to break away. When he did break away, he reached for Craig's revolver. In the ensuing scuffle, the revolver was knocked to the ground. At that point, Patillo lunged toward Sampson, who reacted by drawing his own revolver and shooting Patillo twice at close range in the abdomen.
 
 
 [2]
 42 U.S.C. Sec. 1983 reads in relevant part,
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....
 
 
 [3]
 We recognize the significance of the problem that the Court was attempting to address in Parratt. Because prisoners' lives are comparatively more regulated by government officials than are the lives of unincarcerated persons, a logical development accompanying the expansion of section 1983 liability has been significant increase in the numbers of prisoner claims filed in federal court. See Turner, When Prisoners Sue: A Study of Prisoner Section 1983 Cases in the Federal Courts, 92 Harv.L.Rev. 610 (1979). This expansion has strained the resources of the federal courts, and the frivolous nature of many of the claims has arguably led some courts to treat even those few with merit to little more than summary justice. See id. We trust, however, that the Court's attempt to remedy the particular problem of frivolous prisoner suits in Parratt was not intended to extend to claims such as the one before us, which allege harms much graver than that involved in that case
 
 
 [4]
 Some courts have adopted yet another limitation articulated by Justice Blackmun in Parratt; "I do not read the Court's opinion as applicable to a case concerning deprivation of life or liberty." 451 U.S. at 545, 101 S.Ct. at 1918. (Blackmun, J., concurring). See, e.g., Wilson v. Beebe, 743 F.2d 342, 348 (6th Cir.1984); Brewer v. Blackwell, 692 F.2d 387 (5th Cir.1982). See also Hudson v. Palmer, --- U.S. ----, ----, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984) ("Parratt is necessarily limited by its facts to negligent deprivations of property."). Cf. Kimbrough v. O'Neil, 523 F.2d 1057, 1065 (7th Cir.1975) (Stevens, J., concurring) (distinguishing property deprivations from liberty deprivations on the ground that the former can be satisfied by a postdeprivation hearing), opinion on rehearing en banc, 545 F.2d 1059 (7th Cir.1976). This distinction is supported by the rationale that since Parratt 's intent is to exclude the less egregious harms from the scope of constitutional analysis, and since life or liberty interests, unlike property interests, cannot be fully protected by affording postdeprivation remedies, only property rights are within the scope of the Parratt analysis. While we recognize that life and liberty hold a higher place than property in the hierarchy of constitutional interests, compare Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (property interests are not created by the constitution, but are defined by independent standards such as state law) with Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 2974-75, 41 L.Ed.2d 935 (1974) (there exists a core of liberty interests protected by the constitution itself regardless of state law), our disposition of this case makes it unnecessary for us to use this form of analysis
 
 
 [5]
 The district court's opinion noted that the plaintiff had asserted a fourth amendment claim for unreasonable seizure, but the court did not squarely address the merits of that claim. We find that the issue is properly before us because the plaintiff reasserted it in her brief before this court. As for the eighth amendment claim, we express no opinion because plaintiff does not press it in her appeal
 
 
 [6]
 When Officer Sampson first joined the Atlanta police department in 1973, he received the standard six week training course then provided at the police academy. A number of citizen complaints were filed against him from 1973 to 1978. His first performance evaluation rated him as "average," except in noting that he should curb his temper and improve his judgment in tight situations. A later evaluation rated him somewhat higher and offered no negative comments. Sampson resigned in 1978, but was rehired later that year with one day of reorientation and no psychological testing. Craig, who was hired in 1978, received thirteen weeks of academy training as well as psychological testing. He also underwent eight weeks of on-the-job training followed by six months on probationary status before being permanently hired
 
 
 [7]
 The plaintiff also asserted that the city should be held liable on the ground that it knew that Atlanta police officers customarily used excessive force and condoned such activity. The district court properly found that she had failed to produce sufficient evidence to substantiate those claims
 
 
 [8]
 See Williams v. City of Valdosta, 689 F.2d 964 (11th Cir.1982); Hearn v. City of Gainesville, 688 F.2d 1328 (11th Cir.1982) (cited in Gilmere v. City of Atlanta, 737 F.2d 894, 904 (11th Cir.1984))
 
 
 [9]
 See, e.g., Tuttle v. City of Oklahoma City, 728 F.2d 456, 459 (10th Cir.1984) (adopting gross negligence standard), rev'd on other grounds, --- U.S. ----, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (the use of a gross negligence standard not addressed by a majority of the Court, see, e.g., --- U.S. at ---- n. 7, 105 S.Ct. at 2436 n. 7 (plurality opinion)); Owens v. Haas, 601 F.2d 1242, 1246 (2d Cir.), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). Other courts have adopted a standard of liability which borrows from both ends of the spectrum, permitting a finding of municipal liability where the evidence shows indifference to unconstitutional activity that is so widespread as to permit an inference of actual or constructive knowledge. See, e.g., Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir.1984) (en banc); Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir.) (en banc), modifying 728 F.2d 762 (5th Cir.1984) (en banc); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir.1983); Wolf-Lillie v. Sonquist, 699 F.2d 864 (7th Cir.1983) (sheriff's actual or constructive knowledge of prior similar constitutional deprivations attributable to municipality); Avery v. County of Burke, 660 F.2d 111, 114 (4th Cir.1981); Turpin v. Mailet, 619 F.2d 196, 200-01 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Cf. McLaughlin v. City of LaGrange, 662 F.2d 1385, 1388 (11th Cir.1981), cert. denied, 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982)
 
 
 [10]
 We acknowledge that various courts have concluded that a single constitutional violation by a municipal employee can suffice to establish custom or policy. See, e.g., Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir.1980); Leite v. City of Providence, 463 F.Supp. 585, 590-91 (D.R.I.1978). This approach, however, was rejected by the Supreme Court last term in City of Oklahoma City v. Tuttle. Although there was no majority opinion on the municipal liability issue in Tuttle, both the plurality and dissenting justices agreed that an isolated shooting by a police officer cannot, by itself, suffice to prove the existence of a city policy or custom. See --- U.S. at ---- - ----, 105 S.Ct. at 2433-37 (opinion of Rehnquist, J., joined by Burger, C.J., and White and O'Connor, JJ.); 4645-46 (Brennan, J., joined by Marshall and Blackmun, JJ., concurring in the judgment)
 We recognize that an isolated constitutional violation may lead to municipal liability under Sec. 1983 if there is sufficient independent proof that the moving force of the violation was a municipal policy or custom. "A Sec. 1983 cause of action is as available for the first victim of a policy or custom that would foreseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims." Tuttle, --- U.S. at ----, 105 S.Ct. at 2439 (Brennan, J., joined by Marshall and Blackmun, JJ., concurring in the judgment). We reach our present decision that the city is not liable under Sec. 1983 not only because the shooting and beating was an isolated occurrence, but also because the plaintiff has failed to prove that the alleged inadequacy of Officer Sampson's training was the result of a municipal policy or custom within the meaning of Monell.
 
 
 [1]
 At the time of his death Patillo's blood alcohol content was .27 percent. A .10 percent level created a presumption of intoxication under Georgia law. O.C.G.A. Sec. 40-6-392(b)(3) (1982)
 
 
 [2]
 They either struck him with their open palms or employed moderate force using their fists. There were no marks of any type upon Patillo's scalp, which was bald, face, or neck, however
 
 
 [3]
 The city of Atlanta, its Mayor, Public Safety Director, and the Chief of Police were also named in the suit. The City allegedly violated Patillo's constitutional rights by promulgating a policy that permitted the deployment of untrained police officers and the use of excessive force in police-citizen encounters. The additional defendants, the supervisors, were allegedly liable because they implemented this policy in a general way. See infra note 9. The district court found the City liable for violating Patillo's fourteenth amendment due process rights. The court, however, found no liability on the part of the supervisors because the plaintiff failed to prove an "affirmative link" between the supervisors' conduct and the constitutional injury, as required by Rizzo v. Goode, 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976)
 
 
 [4]
 In Brazier v. Cherry, 293 F.2d 401 (5th Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961), the Fifth Circuit acknowledged that the federal civil rights laws do not speak to survivorship of actions, and the courts must, therefore, look to the laws of the states in which they sit to determine if provision is made for the survivorship of a given cause of action. It is undisputed that in Georgia the decedent's claim for damages sustained during his lifetime survives:
 No action for a tort shall abate by the death of either party, where the wrongdoer received any benefit from the tort complained of; nor shall any action, or cause of action, for the recovery of damages for homicide, injury to the person, or injury to property abate by the death of either party. The cause of action, in case of the death of the plaintiff and in the event there is no right of survivorship in any other person, shall survive to the personal representative of the deceased plaintiff....
 Ga.Code Ann. Sec. 3-505 (1978).
 Section 3-505 is distinct from, and should not be confused with, the Georgia wrongful death statute, which at the time of this suit was codified at Ga.Code Ann. Sec. 105-1301 (1978). The Georgia wrongful death statute creates a new cause of action in certain individuals for the value of the decedent's life. I deal here solely with section 3-505, which permits survival of the tort claims the deceased possessed the instant before he died. Accord Brazier v. Cherry, 293 F.2d at 401; Anderson v. Jones, 508 F.Supp. 399 (N.D.Ga.1980).
 As the Georgia Supreme Court put it, section 3-505 provides "for the survival to the administrator of causes of action that exist in the deceased person before his death." Complete Auto Transit, Inc. v. Floyd, 214 Ga. 232, 238, 104 S.E.2d 208, 213 (1958) (husband's suit under wrongful death statute for death of wife not part of the same cause of action as his suit as administrator under section 3-505 for wife's pain and suffering and medical and funeral expenses). See also Wrongful Death Actions in Georgia, 19 Ga.B.J. 277 (1957).
 The district court treated plaintiff's claims as having been brought under the Georgia survival statute and entered judgment for her on that theory. Thereafter, plaintiff objected in a motion to alter or amend judgment, claiming that her complaint also stated a claim for wrongful death. The district court found otherwise in a lengthy written order which I find persuasive and would affirm. Since the trial in this case, Ga.Code Ann. Sec. 3-505 (1978) has been recodified in its entirety as O.C.G.A. Sec. 9-2-41 (1982).
 
 
 [5]
 Plaintiff also asserted several pendent state law tort claims. These claims consisted of assault and battery, false imprisonment, and false arrest. The district court denied the assault and battery claim because it was duplicative of plaintiff's section 1983 due process claim. The court denied plaintiff's false imprisonment and arrest claims because the officers had probable cause to detain Patillo
 
 
 [6]
 Notwithstanding this allegation, the district court correctly construed plaintiff's complaint as not claiming damages for the deprivation of Patillo's life but only for the deprivation of his liberty. See supra note 4. I therefore limit my discussion to the defendants' alleged deprivation of Patillo's liberty interest
 
 
 [7]
 The fourth amendment prohibition of unreasonable seizure was made applicable to the states under the fourteenth amendment in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The eighth amendment prohibition on cruel and unusual punishment was incorporated into the fourteenth amendment by Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). For ease of analysis, hereafter I refer to these guarantees simply as fourth and eighth amendment rights
 
 
 [8]
 The court held the officers liable for $1,000 in compensatory damages and $4,000 in punitive damages for striking Patillo. In addition, the court held Sampson and the City liable for $20,000 in compensatory damages for the shooting. No punitive damages were assessed because Sampson acted in subjective good faith, believing that Patillo had Craig's revolver in hand, see infra note 17, and the City was immune from punitive damage liability under City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)
 
 
 [9]
 The panel also reversed the trial court's determination that the City was liable, holding that a showing of gross negligence on the part of the Police Department in training Officer Sampson did not satisfy the standard for municipal liability under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The panel affirmed the district court's refusal to find the supervisors liable and the court's denial of relief on the state law claims for false imprisonment and false arrest. The majority today declines to reach the issue of whether gross negligence satisfies the requirements of Monell because it concludes as a matter of law that the plaintiff did not establish that the City of Atlanta was grossly negligent. I adhere to the panel's view that gross negligence does not satisfy the requirements for municipal liability enunciated in Monell
 
 
 [10]
 See supra note 4
 
 
 [11]
 The fourth amendment provides in pertinent part:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....
 
 
 [12]
 Some may read the Court's decision in Garner as striking down a Tennessee statute insofar as it authorized officers to shoot nondangerous fleeing suspects. The Court, however, had before it a section 1983 suit for damages arising from a shooting, which required a ruling only on whether the fourth amendment prohibited the officer's conduct. Since the state statute could not cure any fourth amendment violation that might have occurred, its provisions were irrelevant in the Court's analysis of the scope of the fourth amendment
 
 
 [13]
 The Court has made a similar inquiry into a police officer's method of executing a valid search warrant. See Dalia v. United States, 441 U.S. 238, 258, 99 S.Ct. 1682, 1694, 60 L.Ed.2d 177 (1979) ("[t]he manner in which a [search] warrant is executed is subject to later judicial review as to its reasonableness"); Terry v. Ohio, 392 U.S. 1, 17-18, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968) ("[a] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope"). See also, e.g., Duncan v. Barnes, 592 F.2d 1336, 1338 (5th Cir.1979) ("[l]aw enforcement officers having a good faith and reasonable belief in the validity of the search warrant may nonetheless incur liability under 42 U.S.C. Sec. 1983 ... if the warrant is executed in an unreasonable manner")
 
 
 [14]
 It is important to note that Garner involved a suit for money damages. Garner does not suggest that, in the context of a criminal prosecution, in which the guilt or innocence of a defendant is at issue, an inquiry beyond the determination of probable cause to seize the defendant is appropriate. The civil context in which Garner arose accounts for the case being one of first impression to the Court, since prior opportunities for fourth amendment interpretation generally arose in the context of a criminal adjudication
 
 
 [15]
 "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." Tennessee v. Garner, --- U.S. ----, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)
 
 
 [16]
 The district court specifically found that Officer Sampson subjectively believed that his life was in danger. Whether Officer Sampson's conduct was objectively reasonable is a question of law subject to plenary review on appeal. Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir.1981). See Turner v. Orr, 759 F.2d 817, 820 (11th Cir.1985); Gulf Tampa Drydock Co. v. Great Atlantic Insurance Co., 757 F.2d 1172, 1174 (11th Cir.1985)
 
 
 [17]
 The majority argues that the shooting was unreasonable regardless of whether it was done in self-defense because the officer's own conduct, his earlier treatment of Patillo, provoked Patillo's response. The implications of the majority's treatment of the facts in this case are disturbing. In its view, once an unprovoked contact between a police officer and a citizen occurs, any subsequent necessary measures taken by the officer are automatically tainted by the initial unjustified conduct, regardless of how insignificant and minimal the first contact may have been. Thus, an unjustified push or shove by a police officer would give the "victim" a license to escalate the dispute and retaliate with deadly force. According to the majority, a police officer would be held liable for any act taken to thwart the "victim's" use of deadly force--whether it be directed against the police officer or an innocent bystander--because the harm "largely resulted from [the officer's] own improper use of his official power." Ante p. 505. The effect of the majority's factual analysis is to sanction the "victim's" use of deadly force against minor police abuses and to tie the hands of the police officer from protecting himself or others who might be put in danger. Thus, in this case, Officer Sampson could not justify the shooting as self-defense because his earlier conduct made him responsible for all consequences. This is not only untenable, but also contrary to the precepts of the fourth amendment; an officer who uses force in self-defense does not violate the "victim's" constitutional rights. Tennessee v. Garner, --- U.S. at ----, 105 S.Ct. at 1701
 Using the majority's rationale, the ramifications would telescope beyond the bounds of reason. First, under the majority's view, it is irrelevant whether Patillo possessed a gun; even if Patillo had a gun and took aim at Officer Sampson, Sampson's act of self-defense the instant before Patillo pulled the trigger would not be justified because Sampson had in effect become responsible for Patillo's actions. If Patillo had pointed a gun at an innocent bystander in an attempt to stop the alleged police abuse against him and Officer Sampson killed Patillo, Sampson would still violate Patillo's constitutional rights, even though the action was taken to protect the bystander. This is because, under the majority's rationale, such a shooting would be a consequence of Sampson's initial unprovoked contact. It could even be said to follow, consistent with the majority's analysis, that Officer Sampson would be liable for violating the innocent bystander's constitutional rights if Patillo had shot the third party, because the shooting flowed from, and was proximately caused by, Sampson's initial conduct.
 
 
 [18]
 See H. Hockett, The Constitutional History of the United States, 1776-1826, 74 (1939); 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 3-5 (1978)
 
 
 [19]
 Of course, the Constitution provides, in the fifth and sixth amendments, protections from various abuses in the criminal prosecution context. The analysis in the text focuses solely on those constitutional protections provided prior to the initiation of the criminal judicial process, such as was the case in this instance where the officers merely sought to detain a citizen
 
 
 [20]
 This approach to constitutional interpretation mirrors the longstanding rule in statutory interpretation that expression of certain powers implies the exclusion of others, a principle embodied in the ancient maxim, expressio unius est exclusio alterius. See 2 A. Sands, Sutherland on Statutory Construction Sec. 47.23, at 123 (4th ed. 1973). See also Marshall v. Gibson's Prods., Inc., 584 F.2d 668, 675 (5th Cir.1978)
 
 
 [21]
 The majority cites as support for the creation of its substantive right Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Rochin involved the State's using as evidence to obtain a conviction in a criminal trial drugs secured by pumping the stomach of the defendant. The issue before the Court was not whether the due process clause created a fundamental right not to have one's stomach pumped, but whether a conviction based on evidence so obtained rendered the trial and conviction fundamentally unfair. Because Rochin arose in a criminal rather than a money damages context, the case does not sanction a court's creation of a fundamental right to support a damages action. Applying the majority's analysis of Rochin, and putting aside questions of immunity, any state employee who in any way participated in rendering a criminal trial unfair (e.g., by failing to give Miranda warnings, participating in coerced confessions, failing to provide a lawyer, and a host of other constitutional protections in the criminal procedure context) would be monetarily liable under section 1983. Clearly this is an unacceptable result, which suggests that the majority has read Rochin out of context and inappropriately applied its holding in this case
 In addition, Rochin does not represent an instance where the Court created a substantive right which was not specifically enumerated in the Bill of Rights. Rochin was decided before the fourth amendment was applied to the states through its incorporation into the fourteenth amendment. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The result in Rochin achieved nothing more than would have been the case had the fourth amendment been applied. Rochin, therefore, provides no justification for judicial creation of fundamental rights not specifically enumerated in the Bill of Rights.