James Raymond **ELLISON**, etc., **Plaintiff**,

v.

**CITY OF MONTGOMERY**, et al., **Defendants**.

No. Civ.A. 99–T–449–N.

United States District Court, M.D. Alabama, Northern Division.

Oct. 1, 1999.

Angela G. Turner, Caine–Turner & Associates, Birmingham, AL, for James Raymond Ellison, Jr., deceased by and through his next of kin and legal representative, Beth Ellison, plaintiff.

George B. Azar, Elizabeth C. Wible, Azar & Azar, Montgomery, AL, F. Tim McCollum, City Attorney, Montgomery, AL, for City of Montgomery, as respondent superior, John Wilson, Police Chief, Howard Sisson, Officer, Ervin Dailey, Officer, Enrico Darrington, Officer, Michael Trotter, Officer, defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

This lawsuit was originally filed in state court by plaintiff James Raymond Ellison, by and through his surviving spouse, and raised both state and federal claims against defendant City of Montgomery as well as several individual defendants. Defendants then properly removed the case to federal court pursuant to 28 U.S.C.A. § 1441(a) and 28 U.S.C.A. § 1331. By order of July 21, 1999, this court dismissed all defendants and all claims save Ellison's federal claim against the City of Montgomery, brought under 42 U.S.C.A. § 1983, which asserted that the city, acting under color of law, abridged Ellison's federal constitutional rights. The case is currently before the court on the city's motion for summary judgment, filed July 22, 1999. For the reasons that follow, the court concludes that the motion should be granted.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The moving party may discharge its initial burden by demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element of his case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the party seeking summary judgment has thus informed the court of the basis for its motion, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate. *Id.; see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir. 1993). In order to overcome summary judgment, the nonmoving party must provide evidence of specific facts that demonstrate a genuine issue for trial. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

This case arises out of the shooting death of Ellison by a Montgomery police officer. The circumstances surrounding Ellison's death, however tragic, are straightforward and undisputed. At approximately 2:00 a.m. on the morning of April 24, 1997, six Montgomery police officers responded to a 911 call placed by one of Ellison's neighbors reporting a suspected burglary in progress at Ellison's residence. The caller knew that Ellison's tool shed had been burglarized just a few weeks before, and had become suspicious when she saw a pick-up truck back into Ellison's driveway very late at night with its headlights turned off. Unbeknownst to the caller, the truck belonged to Ellison himself, and it was Ellison who had pulled into his driveway while returning home from work.

Shortly after the call was placed, police arrived at Ellison's home, wearing the Montgomery Police Department's third shift uniforms, which consisted of navy blue shirts and pants, military style boots, and baseball caps. The shirts have an identifying arm patch on the sleeve, and the letters "MPD" are stitched on the front of the caps. The officers began to canvas the perimeter of Ellison's home to check for signs of a burglary.

Meanwhile, Ellison was inside his tool shed and unaware of either the 911 call or the police's presence on his property. He heard the noises outside and emerged from the shed with his gun in hand. He shouted two times, "What are you doing?," and, receiving no response, he quickly fired two shots. At least four of the police officers returned fire, one of them fatally wounding Ellison.

In this federal lawsuit Ellison claims that the police officers' use of deadly force against him violated his constitutional rights, and that the City of Montgomery caused this violation through its police policies and practices. Ellison therefore asserts that he is entitled to relief from the city under 42 U.S.C.A. § 1983, which creates a private right of action for individuals whose federal rights are abridged by those acting under color of law.

The City of Montgomery claims that Ellison has failed to present evidence to support certain essential elements of his claims, and that it is therefore entitled to summary judgment. The court agrees with the city for several reasons.

## III. ANALYSIS

### A. Constitutional Violations

■ In order to make out a claim under § 1983, Ellison must first demonstrate that he was deprived of a right secured by the Constitution or laws of the United States. It is not sufficient to demonstrate

that the police officers were negligent under state-tort standards, or that they breached standards of care commonly adopted among members of the law-enforcement profession. *See Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). The testimony of Ellison's expert witness, to the effect that the police officers' conduct fell short of professional standards, therefore is insufficient to carry his claim. Ellison does however assert two constitutional claims: that the Montgomery police officers who used deadly force against him abridged his rights under the fourth and the fourteenth amendments of the United States Constitution. The court will take up each of these claims individually.

*Fourteenth Amendment:* Ellison first alleges that by shooting and killing him, the Montgomery police officer violated his fourteenth-amendment right against deprivation of life without due process of law. Since there is no doubt that Ellison suffered a deprivation of life, the issue turns on whether the deprivation was incurred absent due process. Ellison's claim is one of "substantive" rather than "procedural" due process; he argues not that the government failed to provide him adequate procedural avenues to challenge the deprivation, but rather that the police officers' actions were so clearly devoid of any legitimate governmental purpose that they would offend the Constitution regardless of procedural protections. *See County of Sacramento v. Lewis,* 523 U.S. 833, 838–39, 118 S.Ct. 1708, 1713, 140 L.Ed.2d 1043 (1998).

 The due-process clause of the fourteenth amendment was intended to protect individuals from the abusive and arbitrary exercise of power, and not from the mere accidental effects of lawful actions. *See id.* at 844–45, 118 S.Ct. at 1716; *Daniels v. Williams,* 474 U.S. 327, 333, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986). Thus, it is well established that mere negligence or lack of care on the part of state officials does not implicate the due-process clause. *See Daniels,* 474

U.S. at 333, 106 S.Ct. at 666; *see also Cannon v. Taylor,* 782 F.2d 947, 950 (11th Cir.1986); *Wells v. Walker,* 852 F.2d 368, 371 (8th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). Instead, only government behavior that "shocks the conscience," or "offend[s] even hardened sensibilities" transgresses the bounds of substantive due process. *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952); *see also Lewis,* 523 U.S. at 846–47, 118 S.Ct. at 1717.

What constitutes "conscience-shocking" behavior is not readily determinable on some fixed scale, but rather depends on the circumstances of the particular case. For police officers who are expected to act quickly and decisively in dangerous circumstances to protect themselves and the citizenry, the range of constitutionally permissible actions is somewhat greater than for those state actors who have more time for reasoned calculation. *See Lewis,* 523 U.S. at 852–53, 118 S.Ct. at 1720. In order to determine whether the Montgomery police officers' behavior meets the conscience-shocking standard, the court must balance a number of factors, including "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1500–01 (11th Cir.1985) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

 Ellison bases his substantive due-process claim on three alleged instances of police misconduct. First, he argues that the police officers conducted their investigation of his property in a grossly negligent fashion. Second, he asserts that the officers were grossly negligent in failing to identify themselves to Ellison either verbally or visually through easily recogniz-

able uniforms. Third and finally, Ellison grounds his fourteenth-amendment claim on the police officers' failure to attempt retreat before opening fire on him.

As to the first two charges, Ellison claims that but for the officers' gross negligence, he would have been aware of the police presence on his property and therefore would not have shot at them, which in turn would have obviated the need for the officers to shoot and kill him. Through this extended chain of events, Ellison argues, the police officers' misconduct caused his death. Ellison's claims do not establish the existence of a constitutional violation, however. Ellison has presented no specific evidence to support his bald accusations that the Montgomery police officers' investigation was improper, that their failure to self-identify in the seconds following Ellison's emergence from the shed was negligent, or that their uniforms were not readily identifiable by the public. Even were he to provide such evidence, however, this court finds that negligence of this type could not amount to behavior that "shocks the conscience" and rises to the level of a substantive due-process violation.

■ Ellison's third substantive due-process claim, regarding the officers' failure to retreat, is equally unconvincing in establishing a constitutional violation. The fourteenth amendment does not require that police officers take every possible step to prevent the use of force or even that they use the minimum degree of force possible to serve their purposes. *See O'Neal v. DeKalb County, Georgia*, 850 F.2d 653, 656 (11th Cir.1988). This is not a case in which police officers opened fire on an unarmed or nonthreatening citizen or in which their use of force was excessive or unnecessary. Rather, the Montgomery police officers in this case fired at Ellison only in response to his own use of deadly force. Therefore, they were certainly within the bounds of acceptable conduct under the due-process clause of the fourteenth amendment.

■ *Fourth Amendment:* Ellison also claims that the police violated his constitutional right against unreasonable seizures under the fourth amendment. A "seizure" occurs for fourth-amendment purposes whenever an individual is restrained by a government official to the extent that he is no longer at liberty simply to walk away. *See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Here, Ellison was undoubtedly seized when the police inflicted a fatal wound upon him. The question, then, is whether the seizure was unreasonable under the prevailing interpretations of the fourth amendment.

■ This reasonable analysis requires a balancing of interests. The court must weigh the government's reasons for applying the force as it did against Ellison's interests in liberty and life. Though Ellison's interests here were no doubt of great magnitude, the strength of his interests does not automatically render the officers' use of deadly force for the protection of their own safety and that of others unconstitutional. *Gilmere*, 774 F.2d at 1502. The central question for the court is whether the totality of the circumstances justifies the type of and degree of force used. *Garner*, 471 U.S. at 8, 105 S.Ct. at 1699.

Here again the court must conclude that Ellison has failed to produce sufficient evidence to suggest that the police officer's use of force in this case was unreasonable. By contrast, any reasonable juror would undoubtedly conclude that their use of deadly force in self defense against Ellison's gunshots was well within the realm of constitutionally permissible behavior.

Finally, in addition to arguing that the officers' use of deadly force constituted an unreasonable seizure in violation of the fourth amendment, Ellison argues that his fourth amendment rights were violated by the police officers' unreasonable search of his property. He supports this claim by arguing that the 911 call about a suspected burglary on his property did not create

probable cause, and the police therefore lacked sufficient authority to enter his property. The court need not address the rather questionable merit of this claim. Even if the police did lack probable cause to enter Ellison's property, this breach of his constitutional rights would have no bearing on his § 1983 claim, because the entrance onto his property did not proximately cause his injuries.

### B. Municipal Liability

Since the remaining defendant in this case is not one of the police officers themselves but the City of Montgomery, Ellison must prove not only that the officers violated his constitutional rights, but that there is some basis for holding the city liable for such violations. From the outset, it is clear that the city cannot be liable for the police officers' behavior, because their behavior did not violate the constitution and was therefore not actionable under § 1983. Without proof of a deprivation of a constitutional right, Ellison's claim falls flat as against any defendant.

■ Even if there were some constitutional violation on which to base a theory of municipal liability, however, Ellison's claim would fail. In order to prove that the city should be liable, Ellison would have to demonstrate that the city itself directly caused the violation of his constitutional rights, either through its adoption of or failure to adopt some official policy or practice. *See Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 695, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *Gilmere,* 774 F.2d at 1502–03. A theory of *respondeat superior* is not sufficient to support a § 1983 claim; assertions that the city was generally responsible for the actions of its police officers do not provide a direct enough link between the city's behavior and Ellison's injury to prove liability. *See Monell,* 436 U.S. at 691–92, 98 S.Ct. at 2036–37. In order to prove the existence of or need for such a policy or custom, Ellison would have to provide evidence that the actions taken by the police officers in his case were not merely those of an individual actor in an isolated incident, but rather that they are "so permanent and well settled" as to have "the force of law." *Id.*

■ To support his theory of municipal liability, Ellison has identified the city's failure to train its police officers adequately on the subjects of the use of force, the investigation of burglaries, and self-identification to the public, as the policies that caused his death. A city's failure to train its employees can constitute an official policy that forms the basis for a valid claim of municipal liability under § 1983. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). However, in order to succeed in such a claim, Ellison's theory must overcome two hurdles.

■ First, Ellison must demonstrate that the failure to train is not a mere oversight on the part of the city, but rather amounts to a "deliberate indifference to the rights of the persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204. The Supreme Court elaborated on this standard in *Canton,* asserting that deliberate indifference is only established when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. at 1205. Ellison has not met his burden under this standard. Though a failure to train police officers about the proper use of deadly force might very well demonstrate deliberate indifference if proven, Ellison has presented no concrete evidence about the City of Montgomery's training programs or the alleged inadequacies therein. *Cf. Brown v. City of Elba,* 754 F.Supp. 1551, 1558 (M.D.Ala.1990) (Thompson, J.) (stating that a complete failure to train police about the constitutional limits on the use of deadly force would be so likely to result in constitutional violations as to meet the deliberate indifference standard). Based on the evidence now before the court, even if

viewed in the best possible light, no reasonable juror could find that the city training programs are clearly inadequate, because no evidence has been presented to demonstrate whether or what type of programs exist.

Secondly, Ellison must demonstrate that the failure of the city to provide adequate training actually caused his injuries. *Id.* at 391, 109 S.Ct. at 1206. It is not enough to show that insufficient training programs were in place; Ellison must also demonstrate that his injuries "would ... have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Id.* Clearly, Ellison's claim once again fails. There is simply no basis in the record on which to conclude that Ellison might not have suffered the fatal wound at the police officer's hands if they had received more satisfactory training in investigating burglaries, self-identification, or even in the use of deadly force. In addition to identifying not a single specific shortcoming of the Montgomery Police Department's training programs, Ellison has not presented any other instance in which the lack of training had resulted in injuries to Montgomery citizens.

Finally, Ellison also asserts that the city's use of somewhat non-traditional police uniforms constituted a policy that both demonstrates deliberate indifference and caused his injuries, and therefore gives rise to an actionable claim for municipal liability. He argues that, had the officers been wearing more easily identifiable uniforms, he would not have fired his gun at them, and the police would not have resorted to using deadly force. This argument is also meritless. Ellison presents no evidence to suggest that the third-shift uniforms worn by Montgomery police officers have ever before caused individuals to mistake police officers for criminals, nor has he demonstrated convincingly that this mistake on his part caused his own injuries.

## IV. CONCLUSION

For the foregoing reasons, the City of Montgomery's motion for summary judgment will be granted. An appropriate judgment will be entered.