Romeo CARR and Cedrick
Wymbs, Plaintiffs,

v.

Joseph TATANGELO, in his individual
capacity; Anthony Fortson, in his in-
dividual capacity; and Kipling Dam-
ien Mercer, in his individual capacity,
Defendants.

No. 3:00–CV–1 (DF).

United States District Court,
M.D. Georgia,
Athens Division.

July 31, 2001.

Edward T.M. Garland, Robin N. Loeb, Sam L. Starks, Atlanta, GA, for Romeo Carr, Cedrick Wymbs, plaintiffs.

Joseph C. Parker, Alan J. Gibson, Marietta, GA, for Joseph Tatangelo, in his individual capacity, defendant.

Teri D. Alpert, William T. Casey, Jr., Marietta, GA, Edward Donald Tolley, Jr., Lisa K. Whitfield, Athens, GA, for Anthony Fortson and Damien Mercer, in their individual capacities, defendants.

FITZPATRICK, District Judge.

■ This case involves civil rights claims for damages brought under 42 U.S.C.A. § 1983 by Romeo Carr and Cedrick Wymbs against Joseph Tatangelo, Anthony Fortson, and Kipling Damien Mercer, all of whom were police officers employed by the Monroe Police Department at the time the events giving rise to this case occurred.[1] Plaintiffs also assert various state-law claims against Defendants. Before the Court are Defendants' motions for summary judgment[2] in which each officer asserts that he is entitled to qualified immunity.[3] In addition to the

---

1. There are two other cases that are related to this case currently pending before the Court. *See Carr v. Tatangelo*, No. 3:00-CV-2 (DF) (M.D.Ga. filed Jan. 3, 2000); *Carr v. City of Monroe*, No. 3:00-CV-133 (DF) (M.D.Ga. filed Nov. 14, 2000). Although these three cases all arise out of the same basic sequence of events that occurred in the early morning hours of October 24, 1999, and although they involve basically the same parties, the Court has agreed not to consolidate them into a single case. However, the Court strongly encourages the parties to do everything possible to keep the costs of litigating three separate cases down.

2. Defendants filed separate motions and briefs in support thereof, but many of their arguments are identical. Thus, for the sake of simplicity, in this order the Court often will not differentiate between which officer is making a particular argument, but instead will refer to their arguments as being asserted collectively.

3. In their joint answer, Fortson and Mercer failed to plead qualified immunity specifically as an affirmative defense, though they did plead the defense of official immunity. First, the Court notes that "[q]ualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Second, although the Court admits that the term "official immunity," when used in the context of federal civil rights law, is a generic term that includes both absolute immunity and qualified immunity, *see Doe v. McMillan*, 412 U.S. 306, 318–20, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), counsel is advised that it is preferable to use the specific term "qualified immunity" when referring to the immunity available to a police officer in a federal civil rights action. Specifically pleading qualified immunity is particularly important in cases, such as this case, that involve state-law claims because official immunity is, in Georgia, a defense to which certain public officials are entitled under the state constitution. *See* Ga. Const. art. I, § 2, ¶ IX(d). Nevertheless, because official immunity technically encompasses qualified immunity, and because Plaintiffs cannot claim prejudice or unfair surprise at having to

parties' briefs, the Court has considered the parties' arguments presented during oral argument on July 11, 2001.

## I. STANDARD OF REVIEW

Under Rule 56, summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (internal quotation marks omitted). If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324–26, 106 S.Ct. 2548. This evidence must consist of more than mere conclusory allegations or legal conclusions. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991).

## II. FACTS

The facts of this case that are relevant to the issues raised by Defendants' motions are relatively simple and straightforward. At approximately 2:00 a.m. on October 24, 1999, Plaintiffs walked out of Carr's house, which was on New Lacy Street in Monroe, Georgia, as a man named Harold Henderson was walking in. Carr was going to speak with a friend who had driven up and wanted to borrow some money, and Wymbs was going up the street to use a pay phone. While Carr was talking to his friend through the passenger-side window of the parked car, Wymbs walked back from the pay phone and stopped at the rear of the car. Wymbs then asked Carr to come to the rear of the car with him because he thought he saw somebody hiding in the shrubs across the street. Thinking that the person in the shrubs was Reggie Williams, who had recently stabbed Carr's brother Daniel, Wymbs threw a rock into the shrubs to roust the person from his hiding place.

In fact, the person Wymbs saw was Tatangelo, not Williams. Defendants had been on patrol in the New Lacy Street area and were looking for two individuals who had fled from the police earlier that night and for drug transactions. While observing a pay phone (the same one used later by Wymbs) for signs of drug activity, Defendants encountered Henderson, who falsely identified himself as Harold Wade. Once Defendants discovered Henderson's true identity, he offered to go to Carr's house and either obtain some drugs himself or have somebody with some drugs come out in exchange for letting him go. After Henderson left, Defendants discovered that there were two or three outstanding warrants for his arrest, so they

---

oppose Fortson's and Mercer's assertion of qualified immunity, the Court finds that Fort-

son and Mercer are not precluded from asserting this affirmative defense.

positioned themselves behind some trees and bushes around Carr's house in order to apprehend Henderson when he came out. Tatangelo positioned himself almost directly across the street from Carr's house, Fortson positioned himself on the same side of the street as Tatangelo, but farther away from the house, and Mercer positioned himself on the side of the house.

As Carr was about to throw another rock at Tatangelo, Defendants each heard a noise that sounded like a round being chambered in a gun. In addition, Tatangelo thought that he saw either Carr or Wymbs holding a gun in his hand. Although both Tatangelo and Fortson then drew their guns, neither fired until Fortson saw either Carr or Wymbs point at Tatangelo with what he believed to be a gun. When that happened, Fortson immediately fired one shot that struck Carr in the abdomen, and then Tatangelo fired a quick burst of approximately eight shots. Plaintiffs ran back into Carr's house, and Defendants radioed for backup and retreated to their cars to regroup and plan how to proceed. Less than five minutes later, Wymbs and Carr's brother Walter went outside and stopped a deputy sheriff's car and told the deputy that Carr had been shot. The deputy also called for backup, and within two minutes several officers from the Monroe Police Department, including Defendants, arrived and secured the scene. At approximately 3:45 a.m., Special Agent Michael Pearson of the Georgia Bureau of Investigation arrived at the scene and, after interviewing witnesses and obtaining a warrant, searched the house. No gun was found inside Carr's house. In the meantime, an ambulance had come to take Carr to a hospital.

## III. DISCUSSION

### A. Section 1983 Claims

Plaintiffs assert two federal constitutional claims, both of which are grounded in the Due Process Clause of the Fourteenth Amendment. Count I of the complaint alleges that Defendants unconstitutionally denied medical care to Carr after he was shot, and Count II alleges that Defendants' overall conduct was so egregious and outrageous that it deprived them of their rights to life and liberty. Although Count II does not specify the basis for the alleged constitutional deprivation, the facts show that it is essentially an excessive force claim. Defendants respond that they are entitled to qualified immunity on both counts.

### 1. Qualified Immunity Principles

"Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Alabama A & M Univ., Bd. of Trs.*, 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). To determine whether a public official is entitled to qualified immunity, the Eleventh Circuit requires district courts to use a two-step burden-shifting analysis. First, the defendant bears the burden of proving that he was acting within the scope of his discretionary authority at the time the alleged violation occurred. *See Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir.2000). Second, if the defendant discharges this burden, the plaintiff then bears the burden of proving that the defendant's acts violated clearly established law of which a reasonable person would have known. *See id.*

Plaintiffs have not disputed that Defendants were acting within the scope of their discretionary authority when the alleged

violations occurred, and the Court has no reason to believe otherwise. *See Harbert Int'l, Inc. v. James,* 157 F.3d 1271, 1282 (11th Cir.1998) (explaining what a defendant must show to establish that his actions were within the scope of his discretionary authority). Therefore, the sole question before the Court is whether Plaintiffs have demonstrated that Defendants violated clearly established law.

■ A "necessary concomitant" to this question is "the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Thus, the proper analytical framework for determining whether a plaintiff's allegations are sufficient to overcome qualified immunity is to decide first whether the plaintiff has alleged the deprivation of a currently cognizable constitutional right and then, only if so, to decide whether that right was clearly established at the time of the alleged deprivation. Indeed, in *Siegert* the Supreme Court emphasized the "desirability" of this approach, *id.* at 233, 111 S.Ct. 1789, and subsequently characterized it as "the better approach." *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Presumably because the circuit and district courts were not obeying this "suggestion," the Supreme Court recently mandated that the federal courts follow this approach in all cases involving an assertion of qualified immunity: "Thus a court *must* first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (emphasis added); *see also Saucier v. Katz,* —— U.S. ——, ————, 121 S.Ct. 2151, 2156–57, 150 L.Ed.2d 272 (2001) (explaining the rationale for this approach); *Wilson v.*

*Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (same). This approach makes perfect sense because "[i]f a plaintiff has not sufficiently [demonstrated] a violation of any constitutional right, it is axiomatic that the plaintiff likewise has failed to [demonstrate] the violation of a 'clearly established' right." *GJR Invs., Inc. v. County of Escambia,* 132 F.3d 1359, 1367 (11th Cir.1998). Accordingly, the Court must initially determine whether Plaintiffs have sufficiently demonstrated a violation of their constitutional rights. If there was no underlying constitutional violation, then Defendants are entitled to qualified immunity, regardless of whether the law was clearly established. *See Hartley v. Parnell,* 193 F.3d 1263, 1270–72 (11th Cir.1999).

**2. Denial of Medical Care**

Count I alleges that Defendants violated Carr's Fourteenth Amendment substantive due process rights because they failed to provide medical care to him after he was shot. Defendants argue that they are entitled to qualified immunity on this claim because they were unaware that Carr had been shot and because Carr has not shown that their conduct violated clearly established law.

■ Before addressing whether Defendants violated Carr's substantive due process right to medical care, the Court must first determine whether Carr even has such a right. Carr argues that he has a substantive due process right to medical care under *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983), in which the Supreme Court held that the Due Process Clause "require[s] the responsible government or governmental agency to provide medical care to persons ... who have been injured while being apprehended by the police." *Id.* at 244, 103 S.Ct. 2979; *see*

*also Thomas v. Town of Davie,* 847 F.2d 771, 772–73 (11th Cir.1988). Although Carr was seized within the meaning of the Fourth Amendment when he was shot, *see* discussion *infra* Part III.A.3, he was not arrested or otherwise apprehended. Therefore, Carr does not fall within the class of persons entitled to medical care under *City of Revere.*

 The Supreme Court has also held that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Unquestionably, this general principle means that the right to medical care attaches under the Cruel and Unusual Punishment Clause of the Eighth Amendment for convicted prisoners and under the Due Process Clause of the Fourteenth Amendment for pre-trial detainees. *See Lancaster v. Monroe County,* 116 F.3d 1419, 1425 n. 6 (11th Cir.1997). However, because Carr was neither a convicted prisoner nor a pre-trial detainee, he has no right to medical care under either of these theories. Plaintiff has not cited, nor has the Court located, a single case decided by the Supreme Court or Eleventh Circuit holding that the Fourteenth Amendment includes a substantive due process right to medical care under the circumstances presented in this case. In the absence of a Supreme Court or Eleventh Circuit holding to the contrary, the Court finds that such a right does not exist in the Due Process Clause. *See Collins v. City of*

*Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (counseling caution when determining whether "to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended"). In fact, the rationale for the general principle articulated in *DeShaney* —that a government official has so restrained the person's liberty that he is unable to care for himself, *see DeShaney,* 489 U.S. at 200, 109 S.Ct. 998— indicates that such a right does not exist in the Constitution. *See Collins,* 503 U.S. at 127–28, 112 S.Ct. 1061 (citing cases in which the Supreme Court has recognized a substantive due process right to medical care for persons whose liberty has been restrained by confinement in a mental institution, by incarceration, and by arrest, and concluding that "[t]he 'process' that the Constitution guarantees in connection with any deprivation of liberty thus includes a continuing obligation to satisfy certain minimal custodial standards"). Because Carr was not arrested or otherwise' taken into custody, no restraint of his liberty (as contemplated by *DeShaney* ) occurred; indeed, Carr was not rendered incapable of seeking medical care for himself after he was shot. Having concluded that the Constitution does not recognize the right asserted by Carr in Count I, there obviously was no constitutional violation. Accordingly, Defendants are entitled to qualified immunity.[4]

### 3. Excessive Force

Count II presents the Court with a rare species of constitutional tort—a claim of

---

4. Even if the Court found that the right asserted by Carr is currently cognizable, Defendants would still be entitled to qualified immunity because, by definition, that right would not have been clearly established on October 24, 1999. Consequently, any genuine issues of material fact as to Count I are irrelevant because factual disputes cannot defeat qualified immunity if the law was not clearly established at the time the constitutional deprivation occurred. *See Courson v. McMillian,* 939 F.2d 1479, 1497 (11th Cir. 1991).

excessive force based on the Due Process Clause of the Fourteenth Amendment. It alleges that Defendants violated Plaintiffs' Fourteenth Amendment substantive due process rights because their conduct "was so egregious and outrageous that it shocks the conscience and shows a callous disregard for the Fourteenth Amendment rights of ROMEO CARR and CEDRICK WYMBS to be free from state deprivations of their life and liberty without due process of law." Specifically, Plaintiffs contend that Tatangelo and Fortson are liable for shooting at them and that Mercer is liable for failing to intervene. Defendants argue that they are entitled to summary judgment on this claim because only the Fourth Amendment permits recovery for an officer's use of excessive force during the course of an arrest, investigatory stop, or other seizure. In other words, Defendants appear to be arguing that Plaintiffs have failed to state a claim upon which relief can be granted because the Fourteenth Amendment does not apply in this case. Plaintiffs respond that the Fourth Amendment is inapplicable because they were not "seized."

▇▇▇▇▇▇ When "addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To this end, the Supreme Court has held that

> *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Id.* at 395, 109 S.Ct. 1865. As this language suggests, the Fourth Amendment does not apply to all claims that an officer has used excessive force; instead, it applies only to excessive force claims that involve an arrest, investigatory stop, or other seizure. *See Wilson v. Northcutt,* 987 F.2d 719, 722 (11th Cir.1993). There being no explicit textual source of constitutional protection against the use of excessive force when the Fourth Amendment is not implicated, such a claim must be analyzed as a substantive due process claim under the Fourteenth Amendment. *See id.* (holding that "a non-seizure Fourteenth Amendment substantive due process claim of excessive force survives *Graham* ").

The critical question, then, is whether Plaintiffs were seized within the meaning of the Fourth Amendment when the shooting incident occurred outside Carr's house.[5] To determine whether there was a Fourth Amendment seizure, the Court turns to the Supreme Court's decision in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In that case, Officers McColgin and Pertoso approached a group of youths in an unmarked car, whereupon the youths panicked and fled the scene. Finding the youths' flight suspicious, Officer Pertoso chased Hodari D. on foot, while Officer McColgin chased the others in the car. Hodari D. ran through an alley and emerged on the same street that Officer

---

**5.** Because it is clear that Plaintiffs were not arrested and that the shooting incident was not an investigatory stop, the Court will ex- amine only whether there was an "other seizure."

Pertoso had decided to run down. As Officer Pertoso was about to grab him, he tossed away an object that appeared to be a small rock. Officer Pertoso then tackled and handcuffed him and discovered that he was carrying $130 in cash and a pager and that the rock was actually crack cocaine. The state trial court denied Hodari D.'s motion to suppress the evidence relating to the cocaine, but the California Court of Appeals reversed, holding that he was unreasonably seized when Officer Pertoso began chasing him and that, therefore, the evidence relating to the cocaine had to be suppressed as the fruit of an unconstitutional seizure. *See id.* at 622–23.

The issue presented to the Supreme Court was "whether, at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment." *Id.* at 623, 111 S.Ct. 1547. Because Hodari D.'s case did not involve the application of any physical force before or during the chase, he based his argument on the proposition that a seizure occurs when " 'the officer, by means of physical force *or show of authority,* has in some way restrained the liberty of a citizen.' " *Id.* at 625, 111 S.Ct. 1547 (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Essentially, his argument was that mere pursuit by an officer constitutes a show of authority to which constitutional protection attaches. *See id.* at 625–26, 111 S.Ct. 1547. The Supreme Court disagreed and held that, when an officer makes a show of authority, a seizure does not occur unless the subject yields to that show of authority. *See id.* at 626, 111 S.Ct. 1547. The Supreme Court explained,

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.... It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of

the law!" at a fleeing form that continues to flee. That is no seizure.

*Id.* Furthermore, "neither usage nor common-law tradition makes an *attempted* seizure a seizure." *Id.* at 626 n. 2, 111 S.Ct. 1547. Accordingly, the Supreme Court concluded, "In sum, assuming that Pertoso's pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled." *Id.* at 629, 111 S.Ct. 1547; *see also Brower v. County of Inyo,* 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (holding that pursuit by a police officer does not constitute a seizure unless it causes the suspect to stop).

Under *Hodari D.,* a person is seized within the meaning of the Fourth Amendment only when he is physically touched by a police officer or when he submits to a show of authority. In this case, Defendants argue that the Fourth Amendment applies to Count II because the act of shooting at Plaintiffs was an application of physical force that constituted a seizure. In any event, Defendants argue that Carr was seized when he was actually shot. Plaintiffs respond that they were never seized because they never submitted to Defendants' show of authority. Plaintiffs and Defendants are each correct, but only partially so.

In light of the Supreme Court's holding in *Hodari D.,* the Court finds that shooting at a person does not constitute a seizure within the meaning of the Fourth Amendment unless the person is actually shot (i.e., is physically touched) or is stopped in what he is doing (i.e., submits to the show of authority). *See Menuel v. City of Atlanta,* 25 F.3d 990, 995 (11th Cir.1994); *Bella v. Chamberlain,* 24 F.3d 1251, 1255–56 (10th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1332–33 (8th Cir.1993); *Carter v. Buscher,* 973 F.2d

1328, 1332–33 (7th Cir.1992). Under this principle, Carr was obviously seized when he was shot, regardless of the fact that he was able to scramble back into his house. Thus, under *Graham,* his claim can be analyzed only as a Fourth Amendment claim. However, because Wymbs was not shot and did not submit to Defendants' show of authority, Defendants' conduct as to him did not implicate the Fourth Amendment. Therefore, under *Wilson,* his claim can be analyzed only as a Fourteenth Amendment substantive due process claim.

### a. *Romeo Carr*

Carr has a cause of action only under the Fourth Amendment, but the complaint is devoid of any allegation that Defendants violated Carr's Fourth Amendment rights. Thus, the issue is whether the Court may infer a Fourth Amendment claim from the complaint or construe Count II as a Fourth Amendment claim. In this regard, the Eleventh Circuit has held,

> "Among the cardinal principles of our Anglo–American system of justice is the notion that the legal parameters of a given dispute are framed by the positions advanced by the adversaries, and may not be expanded *sua sponte* by the trial judge." *Doubleday & Co. v. Curtis,* 763 F.2d 495, 502 (2d Cir.1985). A district court may not infer claims other than those that plainly appear on the face of the complaint to defeat a defense of qualified immunity. To do so is to ignore both the heightened pleading standard for § 1983 claims that is the law of this circuit and the Supreme Court's call for a "firm application of the Federal Rules of Civil Procedure" in cases where qualified immunity is asserted. *Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

*GJR Invs., Inc.,* 132 F.3d at 1369. Under this rule, Defendants are entitled to quali-

fied immunity for Count II as it relates to Carr because Carr cannot recover under the Fourteenth Amendment. In reaching this conclusion, the Court notes that Count II unambiguously alleges a violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment and that Plaintiffs have steadfastly maintained that Count II is founded solely on the Fourteenth Amendment rather than on Fourth Amendment. Had there been any ambiguity as to the constitutional basis for Count II, or had Plaintiffs argued in their briefs or during oral argument that Count II was premised on a violation of the Fourth Amendment, the Court may have been able to infer a Fourth Amendment claim or construe Count II as a Fourth Amendment claim. *See O'Neal v. DeKalb County,* 850 F.2d 653, 655 n. 4 (11th Cir. 1988).

### b. *Cedrick Wymbs*

 Having determined that Count II as it relates to Wymbs is properly grounded in the Fourteenth Amendment, the Court must now determine whether Defendants violated his substantive due process right not to be subjected to excessive force by a police officer. The starting point for discussing a substantive due process claim is *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), in which the Supreme Court broadly outlined the contours of a substantive due process claim. In that case, the Supreme Court held that substantive due process is violated only if the government official has done something that "shocks the conscience" or "offend[s] even hardened sensibilities." *Id.* at 172, 72 S.Ct. 205. On the other hand, conduct that does nothing more than "offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically" is not sufficiently egregious to reach constitutional dimensions. *Id.* at 172–74, 72 S.Ct. 205;

see also Gilmere v. City of Atlanta, 774 F.2d 1495, 1500 (11th Cir.1985) (en banc) (noting that "the violations which give rise to a substantive due process claim are necessarily more egregious than those which give rise to simple tort actions").

■ Because of the inherent vagueness in the "shocks the conscience" standard, the Eleventh Circuit "has adopted the more concrete standards for identifying a substantive due process violation that were laid out in *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973) . . . ." *Wilson*, 987 F.2d at 722; *see also Gilmere*, 774 F.2d at 1500–01. Accordingly, when determining whether the force used by a police officer constitutes a substantive due process violation, the following factors must be considered: "the need for force, the relationship between the need for force and the amount of force used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* (internal quotation marks omitted). Applying these factors to this case, the Court finds that Defendants' conduct did not violate Wymbs's substantive due process rights.

As to the first factor, the circumstances that confronted Defendants outside Carr's house during the early morning hours of October 24, 1999, suggested the need for the application of force. Regardless of why Defendants were outside Carr's house, and regardless of the propriety of using Henderson as an informant, the simple fact remains that Tatangelo and Fortson believed that their lives were in danger because they both heard a noise that sounded like a bullet being chambered in a gun.[6] Moreover, both Tatangelo and Fort-

son thought that they saw either Carr or Wymbs holding a gun, and neither fired any shots until Fortson saw what he thought was a gun pointed at Tatangelo. Under these circumstances, and considering the fact that they knew they were in a high-crime area, it was reasonable for Tatangelo and Fortson to believe that their lives were in danger and that they needed to respond with force to protect themselves. Whatever doubt exists as to the reasonableness of their perception of danger is eliminated by the fact that Carr also believed that Wymbs had a gun because he heard a "click-clack" noise. Although Carr now claims that the "click-clack" noise that he heard was the sound of Wymbs folding up his sunglasses, what matters is whether it was reasonable for Tatangelo and Fortson to believe that Wymbs had a gun and that a forceful response was required. Faced with a tense situation that required them to make a split-second decision, the Court concludes that it was reasonable for Tatangelo and Fortson to believe that there was a need for force under the circumstances with which they were faced.

The second factor balances the relationship between the need for force and the amount of force used. Tatangelo and Fortson reasonably perceived that they were faced with deadly force, and they responded in kind with deadly force. Thus, the amount of force with which they responded was directly proportional to the need for force. As to the third factor, Wymbs suffered no physical injury as a result of the shooting incident.

Finally, the fourth factor asks whether force was applied in a good faith effort to maintain or restore discipline or whether it

---

6. This case is different from the situation addressed in *Gilmere*, in which the Eleventh Circuit held that the officer's perceived need for force was not reasonable because it "largely resulted from his own improper use

of his official power." 774 F.2d at 1501. In this regard, *Gilmere* is inapposite because an officer who hides behind some shrubs to conduct surveillance, like Defendants did, has not improperly used his official power.

was applied maliciously and sadistically for the purpose of causing harm. During the oral argument, Wymbs conceded that Defendants did not act sadistically, but argued that they acted maliciously because of the circumstances surrounding their presence outside Carr's house and their allegedly improper use of Henderson as an informant. These arguments are not persuasive because Defendants had a right to be where they were and because their use of Henderson has no bearing on whether they acted maliciously for the purpose of causing harm when they fired at Plaintiffs. Indeed, the fact that Tatangelo and Fortson did not fire until the perceived danger was imminent indicates that they did not act maliciously for the purpose of causing harm, but rather for the purpose of protecting themselves from a perceived life-threatening danger so that they could retreat from the scene.

The Court's analysis of these four factors demonstrates that Defendants did not violate Wymbs's substantive due process rights because, considering the totality of the circumstances, their conduct should not shock the conscience of anybody, even a person with the most tender of sensibilities. Defendants' conduct simply was not sufficiently egregious to exceed the bounds of substantive due process. There being no constitutional violation, Defendants are entitled to qualified immunity.[7]

### B. State–Law Claims

Having dismissed the only grounds for federal subject-matter jurisdiction, the Court declines to continue to exercise supplemental jurisdiction over Plaintiffs' state-law claims. *See* 28 U.S.C.A. § 1367(c)(3) (West 1993). According to the Supreme Court, "When the balance of [judicial economy, convenience, fairness, and comity] indicates that a case properly

belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court *should* decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (footnote omitted) (emphasis added); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Although the Supreme Court's statement in *Cohill* was not intended to "establish a mandatory rule to be applied inflexibly in all cases," it did establish a general rule to be applied in all but extraordinary cases. *Cohill*, 484 U.S. at 350 n. 7, 108 S.Ct. 614. The primary virtues of this rule are that it allows federal courts to better respect the sovereignty of the states, and to better promote justice, by avoiding unnecessary interpretations of state law. *See Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). Simply put, it is preferable for the courts of Georgia to make rulings on issues of Georgia law than it is for federal courts, even those located in Georgia. Because there is nothing unusual or extraordinary about this case, the Court finds no reason not to follow the general rule articulated by the Supreme Court in *Cohill* and *Gibbs*. Accordingly, Plaintiffs' state-law claims are dismissed without prejudice.

---

**7.** The Court's decision that no constitutional violation occurred makes it unnecessary to

decide separately whether Mercer can be held liable for failure to intervene.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions are **GRANTED** as to the federal constitutional claims in Counts I and II. Additionally, Plaintiffs' state-law claims are **DISMISSED WITHOUT PREJUDICE.**